UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MISS UNIVERSE L.P., LLLP,

                Petitioner,

        -against-

SHEENA MONNIN,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

12 Civ. 9174 (JPO)

**[PROPOSED] ORDER AND JUDGMENT
CONFIRMING ARBITRATION AWARD**

This Court has considered the Petition and Memorandum Of Law in Support of the Petition to Confirm Arbitration Award submitted by Petitioner Miss Universe L.P., LLLP ("MUO"), seeking an order to confirm the Final Arbitration Award, dated December 10, 2012, issued in New York City, New York by Retired United States Magistrate Judge for the Southern District of New York Theodore H. Katz, attached hereto as **Exhibit A** (the "Arbitration Award"). Having reviewed and considered MUO's Petition and all papers filed in connection therewith:

      **IT IS ORDERED, ADJUDGED AND DECREED** that the Arbitration Award is confirmed in all respects.

**SO ORDERED.**

Dated:_____

                                 _____
                                   UNITED STATES DISTRICT JUDGE

# EXHIBIT A

```
JAMS ARBITRATION
NO. 1425011630
----------------------------------- X
MISS UNIVERSE L.P., LLP,             :
                                     :
            CLAIMANT,                :
                                     :
                                     :
                                     :
            -against-                :
                                     :
                                     :
SHEENA MONNIN,                       :
                                     :
            RESPONDENT.              :
                                     :
----------------------------------- X
```

**FINAL ARBITRATION AWARD**

**COUNSEL:**

Scott S. Balber
Timothy L. Foster
Cooley LLP
1114 Avenue of the Americas
New York, New York 10036
Counsel for Claimant

Richard F. Klineburger, III
Klineburger & Nussey
1313 Race Street
Philadelphia, PA 19107

**ARBITRATOR:**

Theodore H. Katz
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018

**PLACE OF ARBITRATION:**

New York, New York

**DATE OF AWARD:** December 10, 2012

The UNDERSIGNED ARBITRATOR, having been designated in accordance with the JAMS Rules for Appointment of Arbitrator, and having examined the submissions, proof and allegations of the parties, finds, concludes, and issues this AWARD as follows:

## I. INTRODUCTION AND PROCEDURAL STATEMENT

Claimant Miss Universe L.P., LLLP, entered into an agreement with Respondent Sheena Monnin, in the form of an Official Entry Form/Contract for the 2012 Miss USA Pageant ("the Agreement"), in which the parties agreed that with respect to any claim or controversy arising out of or relating to the Agreement, they would first attempt to settle the dispute by mediation administered by JAMS. If unsuccessful, they would then submit to binding arbitration by JAMS in the County of New York, State of New York, in accordance with the JAMS Expedited Arbitration Rules and Procedures.

After failing to secure Respondent's participation in mediation, on June 25, 2012 Claimant filed a Demand for Arbitration and Statement of Claim, which was served on Respondent. The Statement of Claim asserts that Respondent made libelous and defamatory statements about Claimant, which were intended to and did harm the business and reputation of Claimant. It is further alleged that these defamatory statements constituted a breach of the Agreement. In a letter dated July 18, 2012, Respondent's counsel confirmed his representation of Respondent, denied that Respondent entered into any agreement with Claimant, and stated that Respondent is not subject to any arbitration provisions and would not participate in any JAMS proceedings. Although Respondent's counsel was notified of a preliminary conference to be held on September 14, 2012, he failed to participate in the conference. An Order was issued on September 19, 2012 ("Scheduling Order"), in which the parties were (1) directed to submit pre-hearing memoranda and witness lists on or before October 26, 2012, and (2) notified that the Arbitration Hearing would take place on November 5, 2012. Pursuant to the Order, Claimant issued document requests to Respondent (Hearing Exhibit ("H. Ex.") 39, but no responses were provided. Respondent also failed to file any pre-hearing submissions.

The Arbitration was heard on November 5, 2012, in the JAMS New York Resolution Center. Respondent failed to participate, and, thus, is in default. The following witnesses testified at the Hearing: (1) Paula Shugart, President of the Miss Universe Organization; (2) Tal Goldhammer, a partner at Ernst & Young; (3) Craig Heitkamp, a state director and franchisee of the Miss Universe Organization; and (4) Jonathan Low, a principal of Predictive Consulting. In addition, Claimant offered documentary evidence, which was admitted. Claimant's Post-Hearing Brief was submitted on November 13, 2012.

## II. FACTS

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award. They are derived from the testimony and evidentiary exhibits presented at the Hearing, as well as inferences drawn in light of Respondent's default and failure to produce responsive discovery. To the extent that this recitation differs from any party's position, that is the result of determinations by the Arbitrator as to credibility, relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

Claimant, The Miss Universe Organization ("MUO"), has been in existence for 62 years. It produces the Miss Universe and Miss USA competitions, and also franchises competitions in the 50 states and District of Columbia, as well as approximately 90 foreign countries. The state competitions determine who will represent each state in the Miss USA Pageant. The winner of the Miss USA Pageant gets to participate in the Miss Universe Pageant, along with the winners of other countries' pageants. Respondent Sheena Monnin ("Respondent" or "Monnin") won the title of Miss Pennsylvania in December 2011, and competed in the 2012 Miss USA Pageant as Miss Pennsylvania USA 2012.

As a condition of participating in the Miss USA Pageant, Monnin was required to submit an Official Entry Form/Contract. Respondent signed the Contract on December 4, 2011, and it was counter-signed on Claimant's behalf on February 7, 2012. (See H. Ex. 1.) The Agreement contains various representations and commitments by Claimant, and specifically provides that

3

> [i]f any controversy or claim arising out of or
> relating to this Agreement, the breach of any term
> hereof, or my participation in or in connection with
> the Pageant cannot be settled through direct
> discussions, the parties agree to endeavor to first
> settle the controversy or claim by mediation conducted
> in the County of New York, State of New York and
> administered by JAMS . . . under its applicable
> rules, before commencing any proceedings permitted
> under this paragraph. . . . If any controversy or
> claim is not otherwise resolved through direct
> discussions or mediation, it shall be resolved by
> binding arbitration conducted in the County of New
> York, State of New York, and administered by JAMS . .
> . .

(Agreement ¶ 22.)

Another provision of the Agreement, relied upon by
Claimant, states that Respondent,

> from the date [she] sign[s] this Agreement until one
> day after Miss USA 2012 is selected, . . . agrees[s]
> not to engage in any activity that might bring . . .
> the Miss USA Pageant . . . [or] the Miss USA Pageant
> system . . . into public disrepute, ridicule, contempt
> or scandal or might otherwise reflect unfavorably upon
> any of the foregoing individuals or entities . . .

(Id. ¶ 5(1).)

Monnin participated in the Miss USA competition. On
June 3, 2012, the Preliminary Results were announced,
identifying the sixteen (16) semifinalist contestants who
would participate in the televised Miss USA Pageant. (H.
Ex. 10.) Monnin was not one of those chosen and,
therefore, was not an active competitor during the final
televised competition. Within minutes of the announcement
of the preliminary results, Monnin sent an iMessage to
Randy Sanders, the Director of the Miss Pennsylvania USA
Pageant, stating that "this is f-ing rigged Randy." She
questioned how two other contestants could have made it
through the preliminary competition and stated "I'm done.
This is ridiculous" and "It's obviously rigged so the girl
that they want can shine; they kept several beautiful girls
out for that reason." (H. Ex. 15.)

The televised Miss USA Pageant then proceeded with the sixteen semifinalists, fifteen of whom had received the most votes in the preliminary competition and one of whom had been audience-selected.  There was a panel of eight celebrity judges, different from the judges who participated in the preliminary competition, who independently assigned scores to each contestant in a swimsuit and evening gown competition.  The five highest-scoring semifinalists became finalists, who then participated in the interview segment of the competition. Each of the judges then separately ranked the five semifinalists, with the contestant receiving the highest ranking being chosen as Miss USA.  Miss Rhode Island was ultimately chosen as Miss USA.

The next morning, on June 4, 2012, Monnin sent an email to the Miss Pennsylvania director, in which she officially resigned the title of Miss Pennsylvania 2012. (H. Ex. 16.)   In the email, Monnin cited her strong disagreement with the MUO decision to allow transgendered contestants to participate in the competition.  She stated: "I refuse to be part of a pageant system that has so far and so completely removed itself from its foundational principles as to allow and support natural born males to compete in it. This goes against every moral fiber of my being." (Id.)    On the night of June 4, 2012, Monnin publicly announced her resignation in a Facebook post.  She stated: "In good conscience I can no longer be affiliated in any way with an organization I consider to be fraudulent, lacking in morals, inconsistent, and in many ways trashy." (H. Ex. 17.)

In a June 5, 2012 Facebook post Monnin provided a new rationale for her resignation as Miss Pennsylvania.

I agree that it is my moral obligation to state what I witnessed and what I know to be true . . . . I witnessed another contestant who said she saw the list of the Top 5 BEFORE THE SHOW EVER STARTED proceed to call out in order who the Top 5 were before they were announced on stage.  Apparently the morning of June 3rd she saw a folder lying open to a page that said 'Final Show Telecast, June 3, 2012' and she saw the places for Top 5 already filled in.  Thinking she was just seeing a rehearsal fake top 5 from a previous day she walked away, then realized that it had without a doubt

been labeled as the Final Show Telecast, June 3rd.
After the Top 16 were called and we were standing
backstage she hesitantly said to me and another
contestant that she knew who the Top 5 were.  I said
'who do you think they will be?' She said that she
didn't 'think' she 'knew' because she saw the list
that morning.  She relayed whose names were on the
list.  Then we agreed to wait and see if that was
indeed the Top 5 called that night. After it was
indeed the Top 5 I knew the show must be rigged; I
decided at that moment to distance myself from an
organization who did not allow fair play and whose
morals did not match my own.  That is all I know about
this.  If this contestant would like to step forward
as an eyewitness and as being the one who saw the
sheet with the Top 5 already selected before the
judges ever saw the Top 16, then perhaps action can be
taken.  As for me, I believe her words and will not
encourage anyone to compete in a system that in my
opinion and from what I witnessed is dishonest.

(H. Ex. 18.)

     The June 5 Facebook post received responsive comments
from other Facebook users.   Monnin's allegations also
received media attention and were recounted in news stories
around the country.  Although Monnin, along with the other
Miss  USA  contestants,  had  been  briefed  on  how  the
contestants were to be judged, and the extensive measures
in place to assure independent and confidential voting by
the    judges,    in    response    to    Monnin's    allegations
representatives of the MUO reached out to her and offered
to review the judging process with her.   She never
responded to the offer.  Instead, on June 8, 2012, Monnin
appeared on the NBC morning show "Today," and repeated her
accusations  on  national  television.   In  the  interview,
Monnin stated that after the sixteen semifinalists had been
named, Miss Florida USA told her that she had read a list
of the top 5 finalists prior to the beginning of the final
competition.   Monnin claimed that Miss Florida USA recited
the names that had been on the list, and that the actual
five finalists who were announced during the Pageant "were
called out in the order that [Miss Florida USA] saw them on
the list." (H. Ex. 21 (Transcript of "Today" June 8, 2012
Broadcast); see also H. Ex. 20 (DVD of June 8, 2012
Broadcast).)  Monnin stated these facts in the face of Miss
Florida's contention that she had made an offhand joking

remark to Monnin about seeing a list of finalists that was used in the rehearsal prior to the broadcast.

In fact, when questioned by MUO officials, Miss Florida expressed shock that Monnin was claiming that she had identified the five finalists before they were announced. She said that she saw the list used in the rehearsal, in which all of the contestants participated; that she never identified to Monnin the names on the list; and the names that she did see did not correspond to the names of the five announced finalists. Indeed, the actual winner of the Miss USA Pageant – Miss Rhode Island – was not on the list seen by Miss Florida.

Nonetheless, during the "Today" interview, Monnin stated that she knew Miss Florida had been truthful with her because "she had many years of psychological training" and she could tell when someone is joking or being serious. She stated that "what Miss Florida said is true. There's really no doubt in my mind. It's just too, too much evidence pointing to this being fraudulent." (H. Ex. 21 at 4.) Monnin also discussed the fact that she had considered dropping out of the Pageant because of MUO's decision to allow transgender contestants to participate.

MUO received many comments and questions about Monnin's allegations, from the press, the general public, as well as franchisees and other business-related entities. In the months preceding the 2012 Miss USA Pageant, MUO had been planning to stage its 2013 Pageant on the Gulf Coast. It had met with members of the local Congressional delegation and other local politicians, who endorsed the locale of the Pageant and viewed it as a means of increasing tourism on the storm-ravaged Gulf Coast. MUO secured a venue and accommodations for the contestants, and had been in negotiations with a corporate sponsor who was prepared to pay a $5 million site fee to MUO, as a means of burnishing its corporate image. After the 2012 Pageant concluded, MUO resumed discussions with the corporate sponsor, but the sponsor asked about the allegations of "rigging", expressed concern about the effect on its image, and abandoned the proposed sponsorship. As a consequence, MUO hastily made arrangements to stage the Pageant in Las Vegas, where it did not receive a site fee.

In addition, franchisees of state pageants reported

that after the highly publicized allegations of "rigging," they received numerous inquiries about the fairness of the pageants.   One result is that the number of women applying to be contestants, and, therefore, the revenue derived from entry fees, has declined.

## III. ANALYSIS

### A. Liability for Defamation

The Arbitrator concludes that this dispute arises out of and relates to the Contract entered into between Claimant and Respondent and is thus arbitrable. Substantive New York law is controlling.

To succeed on a claim of defamation under New York law, Claimant must prove that (1) a defamatory statement of fact pertaining to Claimant was published to a third party by Respondent; (2) Respondent's fault; (3) falsity of the defamatory statement; and (4) injury to Claimant. See Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000); Epifani v. Johnson, 65 A.D.3d 224, 233, 882 N.Y.S.2d 234, 242 (2d Dep't 2009).   Defamation is the injury to one's reputation, either by written or oral expression. Nevertheless, statements of pure opinion are not actionable as defamation.

Where, as here, the injured party is a public figure,[1] the level of fault that must be proved is actual malice. See Shulman v. Hunderfund, 12 N.Y.3d 143, 147, 878 N.Y.S.2d 230, 232 (2009); Huggins v. Moore, 94 N.Y.2d 296, 301, 704 N.Y.S.2d 904, 907 (1999).   "Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." Celle, 209 F.3d at 182.   Actual malice is subjective, but can be proved through objective facts such as negligence, motive, intent, the dubious nature of the source of the statement and its inherent improbability, that is, whether there are obvious reasons to doubt the truthfulness of the source or the accuracy of the source's report. Evidence of ill will combined with other circumstantial evidence tending to demonstrate that the proponent acted with

---

[1] Claimant concedes for purposes of this proceeding that it is a public figure.

reckless disregard of truth or falsity may support a finding of actual malice. See Celle, 209 F.3d at 182.

In her June 5 Facebook post Respondent published defamatory statements about MUO. Monnin stated that she had been told the names of the five finalists in advance of the judging and public announcement, and that, as a result, the Pageant "must be rigged," and, "from what [she] witnessed, is dishonest." These factual assertions were obviously harmful to MUO's reputation, as the fairness and legitimacy of its Pageants are critical to its acceptance by its sponsors and audience.

Monnin published similar defamatory statements when she appeared on the "Today" show. She stated that there was no doubt in her mind that another contestant told her that she had seen a list of the five finalists before the semifinal competition had even occurred, and that when the names of the five finalists were announced they matched identically and in the precise order the names on the list. Therefore, she stated, the Pageant was dishonest and rigged.

Monnin's statements were factual, capable or proof or disproof, and obviously harmful to MUO's business reputation.

The Arbitrator further concludes that the defamatory statements were false. First, the purported conveyor of the information about the list of semifinalists - Miss Florida - has never endorsed Monnin's version of what occurred. Rather, she told Today Show and MUO representatives that she made a passing, joking remark to Monnin about seeing a list of the semifinalists, and never even told Monnin the names on any list. Moreover, the semifinalist who was ultimately chosen as Miss USA was not even on the list seen by Miss Florida.

Second, Monnin first claimed that the Pageant was rigged after she failed to be selected as one of the sixteen preliminary competition winners. In a June 3 email to the Miss Pennsylvania USA Pageant director, she claimed that "this is f-ing rigged Randy. Seriously? Colorado? South Carolina? I'm done. This is ridiculous. It's obviously rigged so the girl they want can shine." (H. Ex. 15.) She made this allegation even before Miss Florida purportedly told her of the list of five semifinalists.

9

Third, the method in which the Miss USA Pageant is judged, as credibly described in detail by the Ernst & Young official responsible for monitoring and tabulating the votes of the judges, and as set forth in exhibits admitted at the Hearing, precludes any reasonable possibility that the judging was rigged. Independent auditors from Ernst & Young tightly control the judging, and security personnel monitor the celebrity judges. The judges did not make their selections of the five finalists until the evening of the Pageant, after they had the opportunity to view the semifinalists. They did not agree on the finalists on the morning of June 3, 2012, and it is clear that any list that may have been seen by Miss Florida had been created for rehearsal purposes, and did not correspond to the list of the actual finalists. All of the contestants, including Respondent, were instructed on how the judging would occur.

The Arbitrator further concludes that Monnin's defamatory statements were made with actual malice. Monnin claimed the Pageant was rigged within minutes of being passed over as one of the sixteen semifinalists, and before she had any purported factual basis for her allegation of rigging. Moreover, there can be no doubt that she was subjectively aware of the falsity of her statements, as she fabricated the story about being told the names of the five semifinalists. Monnin was also aware that during the pre-competition rehearsal, a list of semifinalists was created and read just for the practice run-through. Thus, even if a list had been seen, the only reasonable conclusion to be drawn was that it was the practice list. In addition, Monnin had a dual motivation for her malicious statements: (1) she was a disgruntled contestant who failed to make it past the preliminary competition; and (2) she strongly disagreed with the Pageant's decision to allow transgender contestants to compete, and had considered dropping out of the Pageant even before the Miss USA competition had begun. In addition, Monnin and the other contestants had been briefed on how the judging was accomplished, and she declined MUO's offer to go over the procedures again after her allegations surfaced. The seven judges, who were celebrities in their own right, had signed a statement of MUO rules that required that the judges act independently, fairly, and impartially or else face the possibility of criminal prosecution. (See H. Ex. 3.) They were required to register their ratings of the contestants confidentially

by computer.   Unless they collectively conspired with MUO to rig the results – a highly improbable scenario for which there is no evidence – there was virtually no possibility that the judging was rigged, and Monnin was well aware of that fact.   Moreover, she made no attempt to seek verification of her allegations from the alleged source of the claim. She therefore showed reckless disregard for whether there was a sound factual basis for her defamatory allegations.

Finally, Monnnin's default in this proceeding and failure to respond to MUO's document request, leads the Arbitrator to draw the adverse inference that Monnin knew that her statements were false and proceeded to publish them with actual malice.[2]

In sum, MUO has satisfied its burden of establishing Monnin's liability for defamation.

## B. Breach of Contract

MUO has a secondary claim of breach of contract. It claims a breach of Monnin's Entry/Form Agreement in the Miss Pennsylvania Pageant as well as in the Miss USA Pageant.   MUO relies on Paragraph 5(a)(4) of the Miss Pennsylvania Agreement (H. Ex. 2.), which provides that if Monnin is selected as Miss Pennsylvania, she agrees that "[d]uring the term of [her] reign as the State Pageant titleholder . . . [she will] "[n]ot . . . engage in any conduct, acts or omissions that may be detrimental to you, your affiliates, others connected with you, the State Pageant or Miss USA Pageant."   The detrimental conduct Monnin engaged in, however, by publicly broadcasting her allegations of fraud and rigging, occurred after Monnin resigned her position as Miss Pennsylvania, on June 4, 2012.   (See H. Ex. 16.)   There was therefore no breach of that Agreement.

Paragraph 5(l) of the Miss USA Pageant Agreement (H. Ex. 1) provides that from the date Monnin signs the Agreement until one day after Miss USA is selected, she will "not engage in any activity that might bring the . . .

---

[2]   Viewed another way, while truth is an absolute defense to a claim of defamation, Monnin has not attempted in this proceeding to prove that her allegations were true.

11

Miss USA Pageant into public disrepute, ridicule, contempt or scandal or might otherwise reflect unfavorably" on the Pageant. Miss USA was selected on June 3, 2012, and Monnin did not publicly publish her defamatory statements until June 5 (her public resignation statement on June 4 did not make any negative factual assertions about the Pageant and, in any event, occurred one day after Miss USA was selected). There was, therefore, no breach of that Agreement. In any event, MUO seeks the same economic damages on its breach of contract claim as on its defamation claim.

### C. Damages

When a statement is defamatory per se, that is, when it is a direct attack on the business or professional integrity of a party, injury will be presumed and the Claimant need not prove special or pecuniary damages. See Celle, 209 F.3d at 179-80; Liberman v. Gelstein, 80 N.Y. 2d 429, 436, 590 N.Y.S.2d 857, 861 (1992); Epifani v. Johnson, 65 A.D.3d 224, 233-34, 882 N.Y.S.2d 234, 242-43 (2d Dep't 2009). In such instances, general compensatory or nominal damages are justified. Nevertheless, where economic damages are claimed, as here, they must be proven. See Gatz v. Otis Ford, Inc., 274 A.D.2d 449, 450, 711 N.Y.S.2d 467, 468 (2d Dep't 2000).

Claimant seeks special damages for economic loss caused by Monnin's defamation, and established that it suffered $5,000,000 in actual damages. Traditionally, MUO holds the Miss Universe Pageant in a major venue in various locations around the world. The host site usually pays a "site fee" to MUO in return for the business and exposure it receives from the event. For example, the 2007 host or site fee paid to MUO was $6.5 million. (See H. Ex. 27 at 14.) Prior to the 2012 Pageant and Monnin's defamatory statements, MUO had engaged in months of negotiations and planning with Gulf Coast officials and businesses to hold the 2013 Miss Universe Pageant in the Gulf Coast region. Logistical arrangements were in place and MUO was in the advanced stages of securing a $5 million site fee from a corporate sponsor that hoped to improve its public image in the region. Political officials and business interests in the region had already reached out to the corporate sponsor, and MUO President Shugart credibly testified that she "had every indication" that finalizing the deal was "just going to be a formality." (H. Tr. at 118.)

Nevertheless, when Ms. Shugart again spoke with the anticipated corporate sponsor after the conclusion of the 2012 Miss USA Pageant, it asked about the "rigging" allegations and expressed concern about how it might affect its image, particularly since image was the primary reason for the sponsorship. It indicated that there would need to be further discussions about the sponsorship with its public relations department. Subsequently, the sponsor's interest dissipated and the sponsorship was rejected. As a result, the Miss Universe Pageant was forced to quickly find an alternative location, which it did in Las Vegas, and it did not receive a site fee for the Pageant.

MUO also seeks damages ranging between $4,300,000 and $7,600,000 for a purported loss of market value as a result of Respondent's defamatory statements. The Arbitrator concludes that these damages have not been established with a reasonable degree of likelihood, no less certainty.

MUO relies on the expert testimony of John Low, a partner at Predictive Consulting who specializes in measuring the financial impact of damages to corporate reputation. Mr. Low first made an assessment of MUO's market value (for what amount the company could be sold) by multiplying its net annual revenue by ten. He viewed that multiple as conservative, as the Valuation Academy evaluated 74 companies in the entertainment industry and found that they sold at 10 to 20 times net revenue. That study, however, was not made available to the Arbitrator and it appears that the companies being valued there were publicly traded, rather than privately held companies like MUO. Mr. Low then looked at data for seven major companies that suffered reputational damage, such as Coca Cola, which, at one time, was alleged to have been the source of illness in Belgian children, and Toyota, whose automobiles were alleged to have defective brakes. Mr. Low found that in the five or six months following an incident that undermined public confidence in the companies' products, there was an average decline in market value of 26%. He also relied on a study of other public companies, where it was concluded that there was an average of 46% loss in market value after they suffered reputational injury. Mr. Low then considered MUO's financials, evidence that there had been some drop-off in the number of contestants in state contests and some hesitation from corporate sponsors after the Monnin allegations, and concluded that the loss in market value of MUO would fall within the range of 7.8%

13

($4.3 million) and 13.8% ($7.6 million).

The Arbitrator accepts that it is likely that Ms. Monnin's defamatory statements had at least a temporary negative impact on MUO's reputation, which is critical to its audience and revenue stream. And, there were some immediate economic consequences, such as the loss of the Gulf Coast sponsorship. Nonetheless, Mr. Low's testimony does not provide a sound basis for the award of damages based on MUO's loss of market value. First, the companies with which Mr. Low compared MUO were all large and publicly traded and their loss of market value was readily ascertainable at a particular period in time by determining the declines in the prices of their stock, as well as sales of their products. (See H. Tr. at 186.) Here, MUO does not have publicly traded stock, or a consumer product, and the loss in its market value was purely hypothetical. As Mr. Low acknowledged, he was attempting to assess how the sale value of MUO would have been affected in the period following the defamatory statements. (See H. Tr. at 204-05.) But MUO was not sold, so it did not suffer any loss of market value damages at the time. Any actual loss of market value in the event of a future sale is speculative. In addition, even Mr. Low arrived at only a potential range of loss of value damages of between $4.3 and $7.6 million, leaving the Arbitrator with no sound basis to fix a reasoned and reasonably precise amount of loss of value. Finally, although Mr. Low testified that, in estimating MUO's loss of market value, he considered evidence of a decrease in contestants and the hesitancy of corporate sponsors to commit after the defamatory statements were made, there is no evidence that he quantified the loss of revenue from those occurrences and then correlated that lost revenue with the loss of market value he estimated.

Accordingly, the Arbitrator concludes that MUO is only entitled to monetary damages in the amount of $5 million.

### D. Injunctive Relief

MUO seeks a permanent injunction requiring Monnin to (1) remove or delete any statements made on any website relating to or referencing MUO, the Miss USA Pageant, or any affiliated pageant or organization, and (2) prohibiting Monnin from making any future public statements related to or referencing MUO, the Miss USA Pageant, or any affiliated pageant or organization.

14

The Arbitrator declines to award such injunctive relief. First, the injunction requested is overbroad, as it is not limited to defamatory statements, but seeks to enjoin any past or future statements relating to MUO or its affiliates. More importantly, any injunction as to future statements would constitute a prior restraint on speech, which, on the facts of this proceeding, is impermissible under New York law. See, e.g., LoPresti v. Florio, 71 A.D.3d 574, 575, 899 N.Y.S.2d 10, 11 (1st Dep't 2010) ("The claim for injunctive relief was properly dismissed because there was no evidence of a sustained campaign to interfere with plaintiff's business that would justify a prior restraint on speech."); Rosenberg Diamond Dev. Corp. v. Appel, 290 A.D.2d 239, 735 N.Y.S.2d 528 (1st Dep't 2002) ("Prior restraints are not permissible, as here, merely to enjoin the publication of libel."); Ramos v. Madison Square Garden Corp., 257 A.D.492, 492, 684 N.Y.S.2d 212, 213 (1st Dep't 1999) ("Even if some form of equitable relief were appropriate for defamation, a dubious proposition at best, the particular equitable relief here sought, a prior restraint, is strongly disfavored.").

The Arbitrator further declines to issue an injunction requiring Monnin to remove her defamatory statements from her Facebook page. As Claimant recognizes, permanent injunctions may only be granted where a party establishes irreparable harm if the injunction is not granted. (See Claimant's Post-Hearing Memorandum at 10.) Moreover, injunctions in defamation actions are highly disfavored, and are reserved for situations where egregious harm is established. Thus, "[w]hile equity will not intervene to restrain the publication of words on a mere showing of falsity, it may intervene when restraint becomes essential to the preservation of a business or other property rights threatened by tortious conduct in which the words are merely an instrument of and incidental to the conduct." Trojan Elec. & Machine Co., Inc. v. Heusinger, 162 A.D.2d 859, 860, 557 N.Y.S.2d 756, 758 (3d Dep't 1990); see also Wolf v. Gold, 9 A.D.2d 257, 259, 193 N.Y.S.2d 36 (1st Dep't 1959) (same); Fashion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836, 849 (E.D.N.Y. 1971) (denying injunctive relief where there was no threatening conduct or threats by defendant, and alleged acts of defamation were not so serious or of such a widespread nature).

There is no evidence here that Monnin has undertaken a

course of conduct deliberately carried out to further an unlawful purpose or to destroy the Miss USA Pageant. She was a disgruntled contestant who has had her day in the sun. The record contains no further defamatory statements after June 8, 2012. Moreover, the matters on Monnin's Facebook page are not disseminated generally to the public or to entities likely to do business with MUO. This situation is therefore distinguishable from that in Guerrero v. Carva, 10 A.D.3d 105, 779 N.Y.S.2d 12 (1st Dep't 2004), cited by MUO, where the court merely allowed for the possibility of injunctive relief because the defendant was disseminating defamatory flyers to public officials, as well as employees, vendors, and tenants of the plaintiff. Further, Monnin's Facebook statements involve a public figure, rather than private individuals who can suffer severe emotional and psychological harm and other injury as a result of the public dissemination of libelous statements, which cannot be remedied through economic damages.

## IV. Costs and Attorneys' Fees

The parties' Agreement does not contain a provision that addresses the right to attorneys' fees or the issue of costs. The parties were instructed in the Scheduling Order that any issue of costs and attorneys' fees was to be addressed at the Hearing. No such issue was raised and Claimant has not sought an award of attorneys' fees or costs in its written submissions. Accordingly, Claimant is responsible for its own costs and fees, including the costs of this arbitration.

## V. CONCLUSION AND FINAL AWARD

For the reasons set forth above, the Arbitrator makes the following Final Award:

1. Claimant Miss Universe Organization has met its burden of proving defamation against Respondent Sheena Monnin.

2. Claimant is awarded monetary damages in the amount of $5 million.

3. The Arbitrator declines to award Claimant monetary damages for loss of market value.

4.   The Arbitrator declines to award injunctive relief.

5.   All other claims for relief are denied.

6.   This FINAL ARBITRATION AWARD resolves all claims submitted to this arbitration and, to the extent that any claim is not specifically mentioned here, it is denied.

7.   Claimant MUO will bear its own attorneys' fees and costs.


DATED:   December 10, 2012




THEODORE H. KATZ

17

State of New York )
                  :ss:
County of New York)

I, Theodore H. Katz, do hereby affirm upon my oath as
Arbitrator that I am the individual described in and who
executed this instrument which is my FINAL AWARD.


THEODORE H. KATZ

DATED: DECEMBER 10, 2012

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Miss Universe L.P., LLLP vs. Monnin, Sheena
Reference No. 1425011630

I, Meredith Stockman, not a party to the within action, hereby declare that on December 13, 2012 I served the attached Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Scott S. Balber Esq.
Mr. Timothy Foster
Cooley LLP
1114 Avenue of the Americas
New York, NY   10036
Tel: 212 479 6550
Email: sbalber@cooley.com
timothy.foster@cooley.com
   Parties Represented:
    Miss Universe L.P., LLLP

Ms. Andrea E. Berner
Miss Universe L.P., LLP
1370 Avenue of the Americas
16th Fl.
New York, NY   10019
Tel: (212) 373-4875
Email: aberner@missuniverse.com
   Parties Represented:
    Miss Universe L.P., LLLP

Richard F. Klineburger III Esq.
Klineburger & Nussey
1313 Race Street
Philadelphia, PA   19107
Tel: 215-568-5155
Email: rfk@klineburgerandnussey.com
   Parties Represented:
    Sheena Monnin

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on December 13, 2012.

Meredith Stockman
MStockman@jamsadr.com