**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------

MISS UNIVERSE L.P., L.L.L.P.,

                    Petitioner,

    -against-

SHEENA MONNIN,

                    Respondent.

----------------------------------------------

Case No. 1:12-cv-09174 (JPO)

Civil Action

**DECLARATION OF RICHARD F.
KLINEBURGER, III IN
OPPOSITION TO PETITIONER
MISS UNIVERSE L.P., L.L.L.P'S
PETITION TO CONFIRM THE
ARBITRATION AWARD AND IN
SUPPORT OF CROSS-MOTION TO
VACATE THE ARBITRATION
AWARD**

    **RICHARD F. KLINEBURGER, III, ESQ.**, declares as follows:

    1.     I am an attorney at law admitted to practice in New Jersey and Pennsylvania. I have personal knowledge of the facts contained herein and respectfully submit this declaration in opposition to the petition of petitioner Miss Universe L.P., L.L.L.P. ("Miss Universe") to confirm the arbitration award and in support of the cross-motion of respondent Sheena Monnin ("Monnin") to vacate the arbitration award.

    2.     On or about June 27, 2012, Monnin and her father, Philip Monnin, reached out to me concerning certain events that had occurred after the June 3, 2012 Miss USA competition, including an arbitration filed against Monnin by Miss Universe and potential claims Monnin may have against Donald Trump ("Trump") as a result of comments he made about Monnin on national television and in the print media.

    3.     At or near the time of my initial consultation with Monnin, she forwarded to me, a copy of a Demand for Arbitration and Statement of Claim that Miss Universe had filed with the JAMS arbitration service. (True copies of the Demand for Arbitration and Statement of Claim are attached hereto as **Exhibits A & B**, respectively.)

4.      Monnin also provided me with an unsigned copy of the OFFICIAL ENTRY FORM/CONTRACT 2012 MISS USA PAGEANT TO COMPETE FOR THE TITLE MISS USA (the "Contract").

5.      I explained to Monnin that in my professional opinion, if indeed she had signed the Contract, her resignation as Miss Pennsylvania may have released her from the Contract and all provisions contained therein so long as all other factors relating to notice provisions were met.

6.      Because the Demand for Arbitration and Statement of Claim were not served with any contract containing an arbitration clause attached, and because Monnin did not provide me with any contract signed by the parties containing an arbitration clause, I concluded that based on the information I had, Monnin did not have to arbitrate.

7.      On July 3, 2012, I wrote to Miss Universe's representatives, with a copy to JAMS, and informed them that Monnin was not bound by the Contract and that she would not be participating in any JAMS Arbitration.  (A true copy of my July 3, 2012 letter to Scott S. Balber, Esq., counsel for Miss Universe, is attached hereto as **Exhibit C**.)

8.      Despite my July 3, 2012 letter, over the next few weeks JAMS continued to send information and invoices for JAMS' services directly to Monnin.

9.      Thus, on July 18, 2012, I wrote another letter to the JAMS Case Manager, stating:

> I apologize for any confusion as to representation and contact
> information with the above-captioned matter.  This correspondence
> will confirm that I represent Ms. Sheena Monnin in this as well as in
> any other ancillary matters.  In any event, Ms. Monnin is not subject
> to any arbitration provisions, has not entered into an agreement with
> your company and she will not be participating in any JAMS
> resolution services at this time.

(A true copy of my July 18, 2012 letter to JAMS is attached hereto as **Exhibit D**.)

10.     JAMS did not respond to my July 18, 2012 letter.

11.     The same day, I wrote to Miss Universe's representatives and reiterated that Monnin was not obligated to participate in an arbitration before JAMS. (A true copy of my July 18, 2012 letter to Mr. Balber is attached hereto as **Exhibit E**.)

12.     At no point did JAMS or Miss Universe's counsel provide me with a copy of any signed agreement to arbitrate between the parties and Monnin could not confirm whether she ever signed such a document. Miss Universe never provided Monnin with a signed copy of the document Monnin signed without review or counsel immediately after she left the stage after having won the Miss Pennsylvania USA pageant.

13.     All the while, I continued to reassure Monnin that she was not obligated to participate in any arbitration and was not bound by the Contract since neither JAMS nor Miss Universe produced an unequivocal agreement to arbitrate signed by Monnin and this opinion was further supported by the fact that she had resigned in any event.

14.     Despite my prior letters, on August 27, 2012, Meredith Stockman, an employee of JAMS, e-mailed Monnin directly (with a cc to me) to "follow up" on Monnin's outstanding invoice to JAMS for its services in connection with the arbitration between Monnin and Miss Universe. (A true copy of Ms. Stockman's first August 27, 2012 e-mail is attached hereto as **Exhibit F**.)

15.     Minutes later, Ms. Stockman sent another e-mail to all parties, including Monnin and myself, seeking to schedule a conference call with The Honorable Theodore H. Katz, U.S.M.J. (retired), who would be serving as the arbitrator in the matter. Ms. Stockman's August 27, 2012 e-mails still did not include any signed agreement to arbitrate. (A true copy of Ms. Stockman's second August 27, 2012 e-mail is attached hereto as **Exhibit G**.)

16.     I was shocked by Ms. Stockman's e-mails and, less than one-half hour after receiving same, sent a response to Ms. Stockman reiterating that Monnin was not contractually obligated to proceed with the arbitration and stating that Monnin had "no intention of going forward

3

with anything involving such dispute resolution." I also reminded Ms. Stockman that Monnin was a

represented party and that Monnin was not to be contacted directly by JAMS' representatives. (A

true copy of my August 27, 2012 letter is attached hereto as **Exhibit H.**)

17.    Ms. Stockman did not respond to my August 27, 2012 letter.

18.    Instead, on August 29, 2012, Ms. Stockman e-mailed all counsel attaching a

"Conference Call Confirmation Letter." (A true copy of Ms. Stockman's August 29, 2012 e-mail is

attached hereto as **Exhibit I.**)

19.    I immediately replied to Ms. Stockman and once again indicated:

> Neither myself nor Ms. Monnin will have a conference call in the
> above captioned matter since there is nothing to have a conference
> call about. Neither myself nor Ms. Monnin ever retained your
> company's services and will not be utilizing your company's services.

(A true copy of my August 29, 2012 letter is attached hereto as **Exhibit J.**)

20.    Ms. Stockman did not respond to my correspondence.

21.    On September 5, 2012, Ms. Stockman e-mailed me directly, this time to follow up on

"a balance reflected on the attached invoice in connection with [Miss Universe v. Monnin]." (A

true copy of Ms. Stockman's September 5, 2012 letter is attached hereto as **Exhibit K.**)

22.    Less than fifteen (15) minutes later, I e-mailed yet another letter to Ms. Stockman,

stating:

> Please send me a signed agreement with **your company** wherein
> either myself and/or my client agreed to utilize your services.
> Otherwise, please leave myself and Ms. Monnin alone.

(A true copy of my September 5, 2012 e-mail is attached hereto as **Exhibit L.**)

23.    Again, Ms. Stockman did not respond to my September 5, 2012 letter.

24.    Having received no substantive response from JAMS, I believed the matter to be

resolved. No signed arbitration agreement had been produced between Miss Universe and Monnin;

even if there was a signed agreement it terminated when she resigned; and there was no signed

4

agreement with JAMS. Thus, although I alone was copied on correspondence from JAMS after September 5, 2012, I felt it unnecessary to respond or to forward same to Monnin. Thus, for about two months between September and November 2012, I had no communication with Monnin regarding JAMS or Miss Universe's attempt to arbitrate at a hearing on any particular date.

25.     On Friday, November 2, 2012, I received a short e-mail from JAMS indicating that the arbitration would be proceeding the following Monday, November 5, 2012. Monnin was not copied on that e-mail. (A true copy of JAMS' November 2, 2012 letter is attached hereto as **Exhibit M.**)

26.     After I received JAMS' November 2, 2012 correspondence, I wrote to counsel for Miss Universe and reiterated my position that Monnin "was not subject to any arbitration agreement with regard to her former association with the Miss Universe Pageant." I also enclosed a draft complaint against Trump that I contemplated filing on Monnin's behalf in the event the parties could not amicably work out their disputes. (A true copy of my November 2, 2012 letter is attached hereto as **Exhibit N.**)

27.     On December 10, 2012, Monnin's father wrote to me and stated:

> **First, I want to thank you on behalf of Sheena and our family for successfully removing [Miss Universe's] threat of arbitration.** We did not know what to do and your help was appreciated very much.
>
> Also, it does not appear that you want to pursue the matter any farther [SIC] with Mr. Trump. I want you to know that we understand if this is your decision. However, we really need to know the context and substance of your last conversation with them so we can be informed.

(A true copy of Philip Monnin's December 10, 2012 e-mail is attached hereto as **Exhibit O** (emphasis added).)

28.     I did not immediately respond to Mr. Monnin's December 10, 2012 e-mail.

29.     Three days later, on December 13, 2012, Ms. Stockman e-mailed me a copy of the

Final Arbitration Award entered by Arbitrator Katz.  (A true copy of Ms. Stockman's December 13,

2012 correspondence is attached hereto as **Exhibit P**.)

30.     It was at that time that I first learned, contrary to Philip Monnin's December 10,

2012 e-mail and unbeknownst to Monnin, that the Arbitration had proceeded before Arbitrator Katz

on November 5, 2012.  (A true copy of the Final Arbitration Award is attached hereto as **Exhibit**

**Q**.)

31.     After receiving a copy of the Final Arbitration Award, I sent a letter to Ms.

Stockman, stating:

> Please be advised that I never requested to go forward with arbitration
> in the above captioned matter.  For some strange reason, you people
> think by sending me bills and correspondence relating to a matter in
> which I had no involvement, somehow or another makes me
> responsibility [SIC].  **Let me make this clear:  I do not represent**
> **Ms. Monnin with regard to this matter.  I did not sign any**
> **documentation subjecting either myself or Ms. Monnin through**
> **this process.**  Please stop bothering me.  This is annoying.  I owe
> nothing.

(A true copy of my December 13, 2012 letter to Ms. Stockman is attached hereto as **Exhibit R**

(emphasis added).)

32.     On December 13, 2012, I advised Monnin that an arbitration hearing been held in her

absence and that an award had been entered against her.

33.     The first time I saw any signed arbitration agreement was when Miss Universe

attached one to its Petition to Confirm the Final Arbitration Award filed in this Court.

34.     Regardless, Monnin clearly did not have actual notice of the arbitration hearing and

had understood the arbitration process to have been concluded before and without a hearing.  I did

not believe Monnin was obligated to participate in the proceedings and/or attend the hearing if held,

6

and, therefore, did not forward JAMS' communications including the notices with the hearing date to her.

35.     In fact, it was not until after the Final Arbitration Award was entered that I first informed Monnin that an arbitration hearing date had been set and a hearing conducted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Richard F. Klineburger, III

Date: February 4, 2013

7