# EXHIBIT H



THE RESOLUTION EXPERTS®

# APPOINTMENT OF ARBITRATOR

NOTICE TO ALL PARTIES                                         July 13, 2012

   Re:   Miss Universe L.P., LLLP vs. Monnin, Sheena
         Reference #: 1425011630

Dear Parties:

Hon. Theodore H. Katz (Ret.) has been appointed as Arbitrator in the above-referenced matter. In accordance with the JAMS Streamlined Arbitration Rules no party may have *ex-parte* communications with the Arbitrator. Any necessary communication with the Arbitrator must be initiated through the case manager.

The Arbitrator will bill in accordance with the enclosed Fee Schedule. Each party will be assessed a pro rata share of all fees and expenses, unless JAMS is notified otherwise by the Arbitrator or parties. JAMS will also administer the case consistent with JAMS Cancelation/Continuance policy. Any party who cancels or continues a hearing after the deadline will be responsible for 100% of the professional fees unless we can fill the reserved but unused time with another matter.

Under appropriate circumstances, the Arbitrator may award against any party JAMS' fees and expenses. JAMS agreement to render services is not only with the parties, but extends to the attorney or other representative of the parties in the arbitration.

The parties have been billed a preliminary retainer to cover the expense of all pre-hearing work, such as reading, drafting of orders, and conference calls. Enclosed is an invoice for this retainer. Upon receipt of payment, a Preliminary Arbitration Management Conference Call will be scheduled with the Arbitrator.

Contact me at 212-607-2791 or mveglia@jamsadr.com if you have questions.

Sincerely,

Monica Veglia
Case Manager
mveglia@jamsadr.com
Direct: 212-607-2791


Enclosure

## SERVICE LIST

| | |
|---|---|
| **Case Name:** | <u>Miss Universe L.P., LLLP vs. Monnin, Sheena</u> |
| **Reference #:** | 1425011630 |
| **Panelist:** | Katz, Theodore H., |

**Hear Type:** Arbitration
**Case Type:** Business/Commercial

---

### Scott S. Balber

Chadbourne & Parke
Scott S. Balber
30 Rockefeller Plaza
New York, NY  10112
sbalber@chadbourne.com

Plaintiff
Phone: 212-408-5100
Fax: 646-710-5466

**Party Represented:**
　Miss Universe L.P., LLLP

### Andrea E. Berner

Miss Universe L.P., LLP
Andrea E. Berner
1370 Avenue of the Americas
16th Fl.
New York, NY  10019
aberner@missuniverse.com

Claimant
Phone: (212) 373-4875
Fax: (646) 792-4755

**Party Represented:**
　Miss Universe L.P., LLLP

### Sheena  Monnin

Sheena  Monnin
9244 Marshall Road
Cranberry Twp, PA  16066
Sheena.Monnin@yahoo.com

Defendant
Phone: 412-877-5304

### Lisa  Shapira

Chadbourne & Parke
Lisa Shapira
30 Rockefeller Plaza
New York, NY  10112
LShapira@chadbourne.com

Plaintiff
Phone: 212-408-5100
Fax: 212-541-5369

**Party Represented:**
　Miss Universe L.P., LLLP



THE RESOLUTION EXPERTS



T: 212-751-2700
F: 212-751-4099

Case Manager
Monica Veglia
JAMS
620 Eighth Avenue
34th Floor
New York, NY 10018
212-607-2791 Phone
212-751-4099 Fax
Email:
mveglia@jamsadr.com

**Hon. Theodore H. Katz (Ret.)**

Hon. Theodore H. Katz (Ret.) joins JAMS after serving for 21 years as a United States Magistrate Judge in the Southern District of New York -- one of the busiest and most important federal courts in the nation. During that period, he exercised the full range of judicial responsibilities in over 5,000 complex and other cases -- supervising pretrial activity, addressing discovery and attorney fee disputes, hearing substantive and procedural motions, and presiding over civil and criminal trials. Most notably, Judge Katz developed a reputation as an extraordinary facilitator of settlements. He hosted settlement conferences in more than 2,500 cases, ranging across the full spectrum of the federal court docket, including matters involving employment law, the Fair Labor Standards Act, ERISA, intellectual property, securities law, complex commercial cases, insurance, civil rights, and torts.

Judge Katz is known as a patient, thoughtful, and creative settlement judge. He places great emphasis on the human, as well as the business and financial dimensions of disputes, and enjoys engaging with the participants.

Judge Katz served on the ADR Committee of the United States District Court for the Southern District of New York. He has been on the adjunct faculty at Columbia Law School for six years.

**ADR Experience and Qualifications**
- Served 21 years as a United States Magistrate Judge, presiding over trials and several thousand settlement conferences, supervising pretrial discovery, hearing dispositive and procedural motions, in the following areas:
  - Admiralty
  - Antitrust
  - Art Theft
  - Business/Contracts
  - Civil Rights
  - Class Actions
  - Complex Commercial
  - Construction
  - Employment/Labor/ERISA
  - Entertainment
  - Fair Labor Standards Act
  - Financial Markets
  - Government Regulation
  - Insurance
  - Intellectual Property: copyright, trademark, unfair competition, and patents
  - Professional Liability
  - Securities Law
  - Simple and Mass Torts

**Representative Matters**
- Complex Business Cases/Contracts
  - *Bank of America v. Lemgruber* - supervised pretrial activity and determined damages in amounts in excess of $42 million in action involving embezzlement, breach of fiduciary duty, and fraudulent sale of bank's stock
  - *Aventis Environmental v. Scotts Co.* - supervised pretrial activity in action alleging multi-million dollar breach of asset purchase agreement and antitrust violations in the context of the lawn herbicide industry
  - *American Federal Group Insurance v. Barnett Rothenberg* - presided over trial involving breach of fiduciary duty and post-employment non-compete agreement relating to insurance agency partnership - see decision at 2003 WL 22349673 (S.D.N.Y. 2003)
  - *Weizmann Institute v. Neschis, et al.*
    *Jung v. Neschis* - supervised pretrial activity and issued various orders in actions alleging undue influence in the establishment of an international trust and Lichtenstein Foundation, and disposition of assets from estate containing extensive art collection - see decision at

Hon. Theodore H. Katz (Ret.) (General Biography)

2009 WL 762835 (S.D.N.Y. 2009)

- o *Wells Fargo Bank v. Setra Corp., Daimler Chrysler AG* - presided over settlement of action involving guarantees of recourse agreements for financing of motor coaches
- o *NSB Retail Solutions v. Tommy Hilfiger* - presided over settlement of breach of contract action arising out of a software license and services agreement for a point-of-sale software system to be used for recording sales, employee hours, and accounting functions in retail stores throughout the country
- o *Federated Retail Holdings, Macy's Dept. Stores v. Sanidown* - supervised pretrial activity and settlement discussions in action alleging UCC violations, unjust enrichment, and fraud in the inducement relating to sales of down and feather bedding
- o *Woods v. Boston Scientific Corp.* - presided over preliminary injunction hearing and settlement discussions in action involving alleged breaches of merger agreement for medical devices companies, including earn out payments in excess of $700 million to former shareholders and matters related to operational control of merged company - see *Woods v. Boston Scientific* - 2006 WL 4495530 (S.D.N.Y. 2006)

- **Financial/Insurance**
  - o *Anwar v. Fairfield Greenwich Ltd., et al.* - supervised pretrial activity in consolidated multidistrict litigation alleging claims by investors against "feeder funds" and various banks/investor advisors who invested money in Bernard Madoff Ponzi scheme
  - o *United States Fidelity & Guaranty Co. v. Petroleo Brasileiro* - presided over pretrial activity and trial in complex case involving indemnification obligations of several hundreds of million dollars under performance and payment bonds - see decision at 2005 WL 289576 (S.D.N.Y. 2005)
  - o *Iroquois Master Fund v. CEL-SCI Corporation* - presided over settlement of action alleging that private placement of common stock and warrants triggered price protection and anti-dilution provision in Securities Purchase Agreement
  - o *Ambac Assurance v. EMC Mortgage Corp.* - supervised pretrial activity in action for breaches of warranties and representations in insurance and indemnity agreements related to mortgage backed securities
  - o *Aon Financial Corp. v. Societe Generale* - supervised pretrial activity in complex commercial case involving a surety bond on a loan guarantee, indemnification, and credit default swap
  - o *Dubai Islamic Bank v. Citibank* - supervised pretrial activity and addressed complex privilege issues in action by foreign bank asserting money laundering violations, RICO violations, breach of fiduciary duty, fraud, and negligence that resulted in the loss of over $150 million - see decision at 2000 WL 1159699 (S.D.N.Y. 2002)
  - o *FDIC v. Bober* - presided over settlement of FDIC receivership action against former bank directors for breach of fiduciary duty and negligence
  - o *SEC v. Wextrust Partners, Wextrust Capital, Byers* - presided over settlement of claims by bankrupt entities' receiver against law firm that provided counsel to entities that defrauded investors
  - o *United States Commodities Futures Exchange v. Optiver* - presided over settlement of action brought by the United States Commodities Futures Exchange for alleged price manipulation in heating fuel market
  - o *FTR Consulting Group v. Advantage Fund II Ltd.* - presided over settlement of derivative action alleging improper short-swing trading in common stock of medical research company - see decision at 2005 WL 2234039
  - o *DLJ Mortgage Capital and Credit Suisse First Boston v. ACT Lending Corp. d/b/a American Capital Mortgage* - determined damages of over $41 million in action for breach of mortgage loan repurchase agreement
  - o *Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank* - supervised pretrial activity and presided over settlement of action for breach of contract relating to international currency swap transactions and default valuations
  - o *Pin Financial LLC v. Wentworth Energy Inc.* - presided over settlement of action for breach of Private Placement Agreement related to securing capital investors
  - o *Ingersoll-Rand Co. v. CNA Insurance Co.* - presided over settlement of action seeking declaration of excess liability insurance for defense and indemnity costs for asbestos-related litigation

- **Fair Labor Standards Act**
  - o *Scott v. City of New York* - supervised pretrial activity in class action on behalf of over 15,000 New York City Police Department police officers and detectives claiming the right to overtime pay under the FLSA
  - o *Mullins v. City of New York* - supervised pretrial activity in class action on behalf of several thousand police sergeants in the City of New York seeking overtime pay under the FLSA
  - o *Benavidez v. Plaza Mexico, Inc.* - presided over collective action against restaurant chain for employee claims to overtime and tip payments under the FLSA and New York and New

Hon. Theodore H. Katz (Ret.) (General Biography)

Jersey law - see *Benavidez v. Plaza Mexico Inc.*, 2012 WL 500428 (S.D.N.Y. 2012)
- o *Valcaitiene v. Partners in Care and the Visiting Nurse Service of New York* - presided over settlement of collective action for overtime wages under the FLSA, on behalf of approximately 650 home health aides
- o *Patel v. Baluchi's Indian Restaurant* - supervised pretrial activity and presided over settlement of collection action on behalf of restaurant workers in chain of Indian restaurants
- o *Gersten v. Deloitte & Touche* - supervised pretrial activity in nationwide class action on behalf of auditors in accounting industry seeking overtime pay
- o *Hart v. Rick's Cabaret* - supervised pretrial activity in class action on behalf of over 1,000 entertainers in adult clubs seeking overtime pay under the FLSA

- **Labor/Employment/ERISA**
  - o *In re JP Morgan Chase Retirement Plan* - presided over settlement of consolidated ERISA and age discrimination class actions, also alleging breach of fiduciary duty, on behalf of over 100,000 class members challenging substantive amendments and notices of amendments of retirement plans of predecessor, merged banks
  - o *Levin v. Raynor* - supervised pretrial activity and presided over settlement of class action brought by former officers of ILGWU, against successor-union, challenging loss of life insurance benefits under ERISA - see decisions at 2008 WL 4449457, 2010 WL 2106037
  - o *Adler v. Raynor* - supervised pretrial activity and presided over settlement of ERISA action alleging breach of fiduciary duty by administrators of union retirement plans and dispute between original and successor union with regard to ownership of union assets - see decisions at 2011 WL 5024412, 2012 WL 500428
  - o *EEOC v. Bell Atlantic* - supervised settlement of claims on behalf of a large class of female employees whose retirement service credit was adversely affected by discriminatory maternity leave policy
  - o *National Association of Letter Carriers v. U.S. Postal Service* - presided over settlement in class action brought on behalf of thousands of postal workers claiming improper use of confidential medical information in investigating disciplinary infractions

- **Intellectual Property/Entertainment**
  - o *JA Apparel v. Joseph Abboud* - presided over pretrial activity and trial in action involving trademark infringement, asset sale, and alleged breach of asset purchase agreement - see *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294 (S.D.N.Y. 2010)
  - o *Arista Records v. Usenet* - supervised pretrial activity, ruled on complex spoliation motion, and determined $6.5 million damage award in copyright infringement action relating to USENET (worldwide electronic bulletin board system)
  - o *Pure Power Boot Camp v. Warrior Fitness Boot Camp* - presided over pretrial activity and trial in action alleging trade dress infringement, unfair competition, breach of a non-compete agreement, breach of fiduciary duty, breach of loyalty, theft of trade secrets, and defamation, against former employees who established a competing business - see *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Pure Power Boot Camp v. Warrior Fitness Boot Camp, LLC*, 587 F. Supp. 2d 548 (S.D.N.Y. 2008) (finding that theft of emails constituted a violation of the Stored Communications Act and imposing sanction of preclusion)
  - o *Raymond Weil v. Charlize Theron* - presided over settlement of alleged breach of media advertising contract between renowned watch company and celebrity
  - o *Maharishi Hardy Blechman v. Abercrombie & Fitch* - presided over settlement of trademark infringement action in the fashion industry
  - o *Malletier v. Dooney & Bourke* - supervised pretrial activity and presided over settlement proceedings in trademark infringement action in the fashion industry
  - o *Gellman v. Design Ideas* - supervised pretrial activity and presided over settlement in international trademark infringement/contract dispute over licensing of mark
  - o *Cartier Intl. v. St. Moritz Watch Co.* - presided over settlement proceedings in trademark infringement action
  - o *Asdes de Venustas v. Venustas Intl.* - presided over settlement of trademark dispute in the perfume industry
  - o *The Jane Goodall Institute v. Sprout Foods* - presided over settlement of action alleging breach of contract with respect to licensing of trademark
  - o *AG Fur Atherische Ole & Wella v. Gucci America* - supervised pretrial activity in action arising out of an international trademark licensing agreement for manufacture and distribution of fragrance and cosmetics products, where sales in gray market were alleged - see *AG Fur Atherische Ole v. Gucci America, Inc.*, 2006 WL 838996 (S.D.N.Y. 2006)
  - o *Sandata Technologies v. Infocrossing* - supervised pretrial activity in patent infringement action alleging infringement of patent for tracking hours of home care employees
  - o *UMG Recordings, Inc. v. Select-o-Hits, Inc.* - supervised pretrial activity and determined damages in action for copyright and trademark infringement in distribution of recorded music

Hon. Theodore H. Katz (Ret.) (General Biography)

- o *SOHK Sportswear v. K.S. Trading Corp.* - presided over pretrial activity and settlement of copyright and trademark infringement action relating to use of cartoon characters on sportswear - see decision at 2003 WL 22208352
- o *Calvin Klein Jeanswear v. Tunnel Trading* - presided over action and settlement involving alleged sale of counterfeit goods - see decision at 2001 WL 1456577
- o *Bill Graham Archives v. Dorling Kindersley Ltd.* - supervised pretrial activity and addressed attorney's fee issue in action involving alleged copyright infringement and fair use of Grateful Dead images
- o *Versace v. Gianni Versace* - supervised pretrial activity and settlement discussions in case involving trademark infringement, unfair competition, trademark dilution - see decision at 2002 WL 64610
- o *Troll Company v. Century Novelty* - presided over settlement of copyright infringement action involving world famous "Good Luck Troll Doll"
- o *Cartier v. Montroyal LLC* - presided over settlement of action for alleged trademark infringement of famous Cartier tank watch
- o *Rug Co. v. ABC Carpet* - presided over settlement of action alleging copyright infringement of rug designs
- o *Miroglia s.p.a. v. Morgan Fabrics Corp., Costco, R & M Industries, Inc.* - presided over settlement of copyright infringement action related to fabric design
- o *Cartier v. B. Gray Jewelers* - presided over settlement of trademark infringement and dilution action involving on-line sales of altered Cartier watches
- o *Yngwie Malmsteen v. Cleopatra Records* - presided over settlement of action by composer and recording artist for copyright infringement and unjust enrichment relating to the use of his name and image
- o *Moderne Welt Tourneed v. Cyndi Lauper* - presided over settlement of action seeking damages for concert cancellations

- **Real Estate/Construction**
  - o *Leslie Dick v. George Soros, Conseco Inc., Vornado Realty Trust, et al.* - supervised pretrial activity in action by unsuccessful bidder for the General Motors Building, alleging money laundering, fraud, bid-rigging, RICO violations - see decision at 2009 WL 2190207 (motion to disqualify counsel)
  - o *Sheldon Solow v. Conseco Inc.* - supervised pretrial activity in action involving claim by real estate developer/builder that auction for the sale of the General Motors Building was a sham - see *Solow v. Macklowe Properties, Conseco Inc. et al.*, 2007 WL 1599151 (S.D.N.Y. 2007)
  - o *Travelor's Casualty and Surety Co. v. Dormitory Authority of New York* - presided over pretrial activity and settlement of complex, consolidated actions involving alleged construction defects in a building constructed for the City University of New York
  - o *Underpinning & Foundation Skanska, Inc. v. Travelers Casualty & Surety Co.* - presided in action seeking payment under a Payment Bond for work performed on a construction project - see 728 F. Supp. 2d 339 (S.D.N.Y. 2010)

- **Antitrust**
  - o *Medical Diagnostic Imaging, PLLC, et al. v. Carecore National, LLC, et al.*
    *Alpha Imaging Consultants v. Carecore National LLC*
    *Parkwest Radiology v. Carecore National LLC* – supervised pretrial activity and presided over settlement discussions in consolidated actions alleging antitrust violations by health benefits company coordinating radiology services for insurance companies - see *Medical Diagnostic Imaging, PLLC v. CareCore Nat., LLC*, 542 F. Supp. 2d 296 (S.D.N.Y. 2008)

- **Mass and Complex Torts**
  - o *In re Ski Train Fire in Kaprun Austria* - supervised pretrial activity and settlement discussions in mass tort action brought by relatives of American and foreign-nation citizens who were killed in a fire in a ski tunnel in Austria
  - o *Knox v. Palestine Liberation Organization* - presided over damages hearing on behalf of family of Israeli/American citizen murdered by agents of the PLO, brought under the Anti-Terrorism Act of 1990, awarded over $192 million in damages - see *Knox v. Palestinian Liberation Organization*, 2009 WL 691404 (S.D.N.Y. 2009)
  - o *September 11 Litigation* - addressed issues related to families of September 11 victims' failures to file Notices of Claims against the Port Authority of New York and New Jersey and tolling of the statute of limitations

- **Government Regulation**
  - o *Natural Resources Defense Council v. United States Food and Drug Administration* - presiding judge in action brought to compel the United States Food and Drug Administration to withdraw approval of use of antibiotics to promote growth in poultry and farm animals - see *Natural Resources Defense Council, Inc. v. U.S. Food and Drug Admin.*, 2012 WL 983544 (S.D.N.Y. 2012)
  - o *Morel v. Guiliani* - presided over settlement of class action on behalf of thousands of New

Hon. Theodore H. Katz (Ret.) (General Biography)

York City public benefits recipients seeking a hearing prior to the termination of their benefits
  o *Hercules v. Doar* - presided over settlement of class action on behalf of public benefits
    recipients who received defective notices with respect to the suspension of their benefits
- Civil Rights
  o *McBean v. City of New York* - supervised pretrial activity in class action challenging strip
    searches of thousands of people arrested in New York City
  o *Wise v. Kelly & City of New York*
  o *Casale v. City of New York* - presided over settlement of attorneys' fees and injunctive and
    monetary class-wide relief in action brought on behalf of thousands of people arrested under
    a New York City loitering statute that had been declared unconstitutional

**Honors, Memberships, and Professional Activities**
- Recipient, Fortune Society's Helen L. Buttenweiser Award
- Adjunct Faculty, Columbia Law School
- Member, U.S. District Court, Southern District of New York Committees on Alternative Dispute
  Resolution, Judicial Improvements, Pro Se Litigation
- Member, U.S. District Court, Advisory Panel that Developed Pilot Project Regarding Case
  Management of Complex Civil Cases

**Background and Education**
- U.S. Magistrate Judge, U.S. District Court, Southern District of New York, 1991-2012 (Served as
  Chief Magistrate Judge)
- Director, Prisoners' Rights Project of the Legal Aid Society
- Law Clerk to the Hon. Robert L. Carter, United States District Judge
- J.D., Columbia Law School, 1973 (Editor, *Columbia Law Review*; Harlan Fiske Stone Scholar)
- B.A., *magna cum laude*, Brandeis University, 1968



THE RESOLUTION EXPERTS

# Arbitration Fee Schedule
### Hon. Theodore H. Katz (Ret.)

## PROFESSIONAL FEES

**$700 per hour**

## NON-REFUNDABLE CASE MANAGEMENT FEE

- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.
- The Case Management Fee is reassessed on cases that continue beyond originally scheduled professional time.
- Professional fees include time spent for hearings and pre- and post-hearing reading and research, and award preparation.

*One day is defined as 10 hours of professional time*

| | Fee |
|---|---|
| 1-3 days.................................................................. | $400 per party, per day |
| Time in excess of initial 30 hours................................... | 10% of professional fees |

## CANCELLATION/CONTINUANCE POLICY

| | Cancellation/Continuance Period | Fee |
|---|---|---|
| 1 day or less .................................. | 30 days or more prior to hearing....................... | 100% REFUNDABLE, except for time incurred |
| 2 days or more ............................... | 60 days or more prior to hearing....................... | 100% REFUNDABLE, except for time incurred |
| Hearings of any length ..................... | inside the cancellation/continuance period ............ | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued within the cancellation period unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the party causing the continuance or cancellation is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration award that the Arbitrator has rendered.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is the $400 per party fee for a one-day case. The employer must bear the employee's share of any increased CMF. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. All other fees must be paid by the company.

JAMS agreement to render services is with the attorney, the party, and/or other representatives of the party.

**Atlanta • Boston • Chicago • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 06/08/12



THE RESOLUTION EXPERTS®

# MEMORANDUM

TO:          All parties (see attached service list):
FROM:        JAMS
DATE:        July 13, 2012
RE:          Miss Universe L.P., LLLP vs. Monnin, Sheena
             JAMS Ref. #: 1425011630      Panelist: Theodore H. Katz

Your confidence in selecting JAMS to arbitrate this matter is appreciated. In accordance with JAMS Ethical Guidelines for Arbitrators, the following information is submitted.

Based upon the arbitrator's own knowledge as well as a diligent search of records available to the arbitrator and JAMS personnel, and further based on the information supplied concerning the names of the parties and their counsel, we attach a disclosure report and checklist identifying any prior or pending cases involving the parties, counsel or counsel's firms. The attached report was prepared by JAMS personnel and reviewed by the arbitrator. Nothing in this report would, in the arbitrator's opinion, prevent the arbitrator from impartially serving in this case.

The nominated or appointed arbitrator has made a reasonable effort to inform him/herself of any matters that could cause a person aware of the facts to reasonably entertain a doubt that, as the proposed arbitrator, s/he would be able to be impartial. In addition, s/he has disclosed all such matters to the parties to the best of his/her knowledge according to statutory and ethical guidelines.

Each participant in this arbitration is asked to advise all parties and JAMS of any information that is inconsistent with or not included in the provided disclosure, such as any matters that may affect the arbitrator's ability to be impartial. Please advise the arbitrator's Case Manager Veronica Guevara at 212-607-2761 if you know of any additional information that should be in the disclosure report to all parties. The Case Manager can arrange a conference call to discuss any supplemental information or disclosure questions.

JAMS and the arbitrator will rely upon the parties' disclosure to us of information which is inconsistent with or not included in the disclosure provided.

Any request to disqualify an arbitrator after appointment shall be governed by JAMS Comprehensive Rule 15(i), which provides, "At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties who may respond within seven (7) days of service of the challenge. JAMS shall make the final determination on such challenge. Such determination shall take into account the materiality of the new information and any prejudice to the parties. That decision will be final."



**THE RESOLUTION EXPERTS**

## DISCLOSURE CHECKLIST FOR ALL ARBITRATIONS

Arbitrator Disclosure Checklist pursuant to:
- Code of Ethics for Arbitrators in Commercial Disputes
- JAMS Ethical Guidelines for ArbitratorsCase Title: Miss Universe L.P., LLLP vs. Monnin, Sheena
JAMS Ref. #: 1425011630
Panelist Name: Theodore H. Katz
Checklist supplements disclosure report 16A

|  | Yes | No |
|---|---|---|
| 1. Arbitrator or member of arbitrator's family [The term "member of the arbitrator's family" includes the arbitrator's immediate family or member of the arbitrator's household] is a party, a party's spouse or domestic partner, an officer, director or trustee of a party? | ( ) | (X) |
| 2. Arbitrator or member of arbitrator's family is a lawyer in the arbitration, related to a lawyer in the arbitration or currently associated in the private practice of law with a lawyer in the arbitration? | ( ) | (X) |
| 3. Arbitrator or a member of arbitrator's family has or has had a significant personal relationship with any party or lawyer for a party? | ( ) | (X) |
| 4. Arbitrator is serving or within preceding 5 years has served: | | |
| (A) As a neutral arbitrator in another arbitration involving a party to the current arbitration or lawyer for a party? | ( ) | (X) |
| (B) As a party-appointed arbitrator in another arbitration for either a party to the current arbitration or lawyer for a party? | ( ) | (X) |
| (C) As a neutral arbitrator in another arbitration in which s/he was selected by a person serving as a party-appointed arbitrator in the current arbitration? | ( ) | (X) |
| (D) As a dispute resolution neutral other than an arbitrator in another pending or prior case involving a party or lawyer in the current arbitration. | ( ) | (X) |
| 5. Arbitrator has or has had an attorney-client relationship with a party or lawyer for a party to the current arbitration, including representing the party; an officer, director or trustee of a party; or the arbitrator provided legal advice to a party or a lawyer in the arbitration concerning any matter involved in the arbitration? | ( ) | (X) |
| 6. Arbitrator or arbitrator's family has or has had any other professional relationship with a party or lawyer for a party, including as an expert witness or consultant? | ( ) | (X) |
| 7. Arbitrator or member of arbitrator's family has a financial interest in a party? (The term "financial interest" means ownership of a legal or equitable interest, or a relationship as a director, adviser, or other active participant in the affairs of a party. [See, 28 U.S.C.A. sec. 455.] | ( ) | (X) |
| 8. Arbitrator or member of arbitrator's family has personal knowledge of disputed evidentiary facts relevant to the arbitration? A person likely to be a material witness in the proceeding is deemed to have personal knowledge of disputed evidentiary facts. | ( ) | (X) |
| 9. Is there any other matter that: | | |
| (A) Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial? | ( ) | (X) |
| (B) Leads the proposed arbitrator to believe there is a substantial doubt as to his or her capacity to be impartial, including, but not limited to, bias or prejudice toward a party, lawyer, or law firm in the arbitration? | ( ) | (X) |
| (C) Otherwise leads the arbitrator to believe that his or her disqualification will further the interests of justice? | ( ) | (X) |
| 10. Is the arbitrator not able to properly perceive the evidence or properly conduct the proceedings because of a permanent or temporary physical impairment? | ( ) | (X) |

| | Yes | No |

11. Are there any constraints on the arbitrator's availability known to the arbitrator that will interfere with his or her ability to commence or complete the arbitration in a timely manner?    ( )  (X)

12. Do you participate in social networking sites such as Facebook, Twitter, or LinkedIn?    ( )  (X)

If the arbitrator marked this question, "Yes," it is possible that one of the lawyers or member of a law firm involved in this matter is in some way connected to the Arbitrator through this professional networking application. However, none of these contacts rises to the level of a prior business relationship that might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial, unless otherwise noted below.

If the arbitrator has answered "yes" to any of the above questions, s/he will explain below and/or see attached rider:

Question #:      Explanation:

------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------

**Declarations of Arbitrator:**

1. Having been nominated or appointed as an arbitrator, I have made a reasonable effort to inform myself of any matters that could cause a person aware of the facts to reasonably entertain a doubt that as the proposed arbitrator I would be able to be impartial. In addition, I have disclosed all such matters to the parties.

2. I practice in association with JAMS. I and each other JAMS neutral have an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future.

3. My responses to the questions above are true and correct to the best of my knowledge.

4. Please note JAMS neutrals regularly engage in speaking engagements, CLEs, discussion groups and other professional activities, and it is possible that a lawyer or law firm connected with this proceeding either attended, participated or was on a panel with the Arbitrator.

Date: _____July 12, 2012_____      Signature of Arbitrator: _____Thomas H. _____

**JAMS, Inc.**

MKT016A   Generic Disclosure of Client Activity from 07/11/2007 through 07/11/2012. Panelist:
Theodore H. Katz. Insurance company employees and firms are included. All branches of
counsel firms are included.

7/11/2012                                                                 425 - New York  07/11/2012

Miss Universe L.P., LLLP vs. Monnin, Sheena

- **Counsel for Defendant**

  Sheena  Monnin

  9244 Marshall Road
  Cranberry Twp, PA 16066
  Cases heard with Sheena  Monnin                                          All Locations

  * no other case found *
  Cases heard with                                                         All Locations

  * no other case found *

- **Plaintiff(s)**

  Miss Universe L.P., LLLP

  * No Address Listed *
  Cases heard with Miss Universe L.P., LLLP                                All Locations

  * no other case found *

- **Counsel for Plaintiff**

  Scott S. Balber

  Chadbourne & Parke

  30 Rockefeller Plaza
  New York, NY 10112
  Cases heard with Scott S. Balber                                         All Locations

  * no other case found *
  Cases heard with Chadbourne & Parke                                      All Locations

  * no other case found *

  Lisa  Shapira

  Chadbourne & Parke

  30 Rockefeller Plaza
  New York, NY 10112
  Cases heard with Lisa  Shapira                                           All Locations

  * no other case found *

*The neutral practices in association with JAMS. Each JAMS neutral, including the neutral in this case, has an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future.*

## JAMS ARBITRATION ADMINISTRATIVE POLICIES

### I. Fees for the Arbitration

The Parties and their attorneys agree to pay JAMS for the arbitration as set forth in the Fee and Cancellation Policy attached to and incorporated in this Agreement. JAMS' agreement to render services is jointly with the Party and attorney or other representative of the Party in Arbitration.

Unless otherwise agreed by JAMS, the Parties agree that they are liable for and agree to pay their portion of JAMS' fees and expenses and for all time spent by the arbitrator, including any time spent in rendering services before or after the arbitration hearing. Parties are billed a preliminary retainer to cover the expense of all pre-hearing work, including conference calls. Payment of the preliminary retainer is required prior to scheduling a Preliminary Arbitration Management Conference with the Arbitrator. The Parties agree to pay all invoices received prior to the hearing in advance of the arbitration hearing. If such fees have not been paid prior to the arbitration hearing, the Party or Parties that have not paid remain liable for such fees. The Parties agree that JAMS may cancel an arbitration hearing and will not deliver the arbitrator's decision to any Party without full payment of all invoices.

### II. Records

JAMS does not maintain a duplicate file of documents filed in the Arbitration. If the parties wish to have any documents returned to them, they must advise JAMS in writing within 30 days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing and JAMS reserves the right to impose an additional fee for such special arrangements.

### III. Disqualification of the Arbitrator and JAMS as Witness/Limitation of Liability

The Parties have agreed or hereby agree that they will not call the arbitrator or any employee or agent of JAMS as a witness or as an expert in any proceeding involving the Parties and relating to the dispute which is the subject of the arbitration, nor shall they subpoena any notes or other materials generated by the arbitrator during the arbitration. The Parties further agree to defend the arbitrator and JAMS and its employees and agents from any subpoenas from outside Parties arising out of this Agreement or arbitration.

The Parties agree that neither the arbitrator nor JAMS, including its employees or agents, is a necessary Party in any proceeding involving the participants and relating to the dispute which is the subject of the arbitration. The Parties further agree that the arbitrator and JAMS, including its employees or agents, shall have the same immunity from liability for any act or omission in connection with the arbitration as judges and court employees would have under federal law.

### IV. Party

The term "Party" as used in these Policies includes Parties to the Arbitration and their counsel or representative.



**Document Retention
Policy**

Please note that **30 CALENDAR DAYS** after termination of any case JAMS will destroy the following documents submitted by parties unless parties specifically notify JAMS that they wish to collect their documents:

- Briefs
- Exhibits
- Evidence
- Transcripts

Parties should collect their documents as soon as possible after the termination of a case. Otherwise, they will be destroyed 30 days thereafter. Please note that JAMS does not maintain a duplicate file of documents, which are normally forwarded to the Neutral upon receipt. Any items marked with notes, comments or suggestions by the Neutral will automatically be destroyed upon closing of the file.

Termination of a case is defined as any of the following:

- Resolution of a matter, e.g. either through settlement or issuance of an award
- Mutual agreement to close the matter
- Withdrawal from ADR Process
- Time Period of one year elapses without any resolution and no future dates on calendar
- Notice from JAMS that the matter has been terminated

**<u>PROOF OF SERVICE BY EMAIL & U.S. MAIL</u>**

Re: Miss Universe L.P., LLLP vs. Monnin, Sheena
Reference No. 1425011630

I, MONICA D. VEGLIA, not a party to the within action, hereby declare that on July 13, 2012 I served the attached APPOINTMENT OF ARBITRATOR on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Scott S. Balber Esq.
Ms. Lisa Shapira
Chadbourne & Parke
30 Rockefeller Plaza
New York, NY   10112
Tel: 212-408-5100
Email: sbalber@chadbourne.com
LSchapira@chadbourne.com
   Parties Represented:
    Miss Universe L.P., LLLP

Ms. Sheena Monnin
9244 Marshall Road
Cranberry Twp, PA   16066
Tel: 412-877-5304
Email: Sheena.Monnin@yahoo.com
   Parties Represented:

Ms. Andrea E. Berner
Miss Universe L.P., LLP
1370 Avenue of the Americas
16th Fl.
New York, NY   10019
Tel: (212) 373-4875
Email: aberner@missuniverse.com
   Parties Represented:
    Miss Universe L.P., LLLP

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on July 13, 2012.

MONICA D. VEGLIA
MVEGLIA@JAMSADR.COM

# EXHIBIT I



**THE RESOLUTION EXPERTS**



T: 212-751-2700
F: 212-751-4099

**Case Manager**

Monica Veglia
JAMS
620 Eighth Avenue
34th Floor
New York, NY 10018
212-607-2791 Phone
212-751-4099 Fax
Email:
mveglia@jamsadr.com

**Hon. Theodore H. Katz (Ret.)**

**Hon. Theodore H. Katz (Ret.)** joins JAMS after serving for 21 years as a United States Magistrate Judge in the Southern District of New York -- one of the busiest and most important federal courts in the nation. During that period, he exercised the full range of judicial responsibilities in over 5,000 complex and other cases -- supervising pretrial activity, addressing discovery and attorney fee disputes, hearing substantive and procedural motions, and presiding over civil and criminal trials. Most notably, Judge Katz developed a reputation as an extraordinary facilitator of settlements. He hosted settlement conferences in more than 2,500 cases, ranging across the full spectrum of the federal court docket, including matters involving employment law, the Fair Labor Standards Act, ERISA, intellectual property, securities law, complex commercial cases, insurance, civil rights, and torts.

Judge Katz is known as a patient, thoughtful, and creative settlement judge. He places great emphasis on the human, as well as the business and financial dimensions of disputes, and enjoys engaging with the participants.

Judge Katz served on the ADR Committee of the United States District Court for the Southern District of New York. He has been on the adjunct faculty at Columbia Law School for six years.

**ADR Experience and Qualifications**

- Served 21 years as a United States Magistrate Judge, presiding over trials and several thousand settlement conferences, supervising pretrial discovery, hearing dispositive and procedural motions, in the following areas:
    o Admiralty
    o Antitrust
    o Art Theft
    o Business/Contracts
    o Civil Rights
    o Class Actions
    o Complex Commercial
    o Construction
    o Employment/Labor/ERISA
    o Entertainment
    o Fair Labor Standards Act
    o Financial Markets
    o Government Regulation
    o Insurance
    o Intellectual Property: copyright, trademark, unfair competition, and patents
    o Professional Liability
    o Securities Law
    o Simple and Mass Torts

**Representative Matters**

- **Complex Business Cases/Contracts**
    o *Bank of America v. Lemgruber* - supervised pretrial activity and determined damages in amounts in excess of $42 million in action involving embezzlement, breach of fiduciary duty, and fraudulent sale of bank's stock
    o *Aventis Environmental v. Scotts Co.* - supervised pretrial activity in action alleging multi-million dollar breach of asset purchase agreement and antitrust violations in the context of the lawn herbicide industry
    o *American Federal Group Insurance v. Barnett Rothenberg* - presided over trial involving breach of fiduciary duty and post-employment non-compete agreement relating to insurance agency partnership - see decision at 2003 WL

22349673 (S.D.N.Y. 2003)

o *Weizmann Institute v Neschis, et al.*
*Jung v. Neschis* - supervised pretrial activity and issued various orders in actions alleging undue influence in the establishment of an international trust and Lichtenstein Foundation, and disposition of assets from estate containing extensive art collection - see decision at 2009 WL 762835 (S.D.N.Y. 2009)

o *Wells Fargo Bank v. Setra Corp., Daimler Chrysler AG* - presided over settlement of action involving guarantees of recourse agreements for financing of motor coaches

o *NSB Retail Solutions v. Tommy Hilfiger* - presided over settlement of breach of contract action arising out of a software license and services agreement for a point-of-sale software system to be used for recording sales, employee hours, and accounting functions in retail stores throughout the country

o *Federated Retail Holdings, Macy's Dept. Stores v. Sanidown* - supervised pretrial activity and settlement discussions in action alleging UCC violations, unjust enrichment, and fraud in the inducement relating to sales of down and feather bedding

o *Woods v. Boston Scientific Corp.* - presided over preliminary injunction hearing and settlement discussions in action involving alleged breaches of merger agreement for medical devises companies, including earn out payments in excess of $700 million to former shareholders and matters related to operational control of merged company - see *Woods v. Boston Scientific* - 2006 WL 4495530 (S.D.N.Y. 2006)

- **Financial/Insurance**

o *Anwar v. Fairfield Greenwich Ltd., et al.* - supervised pretrial activity in consolidated multidistrict litigation alleging claims by investors against "feeder funds" and various banks/investor advisors who invested money in Bernard Madoff Ponzi scheme

o *United States Fidelity & Guaranty Co. v. Petroleo Brasileiro* - presided over pretrial activity and trial in complex case involving indemnification obligations of several hundreds of million dollars under performance and payment bonds - see decision at 2005 WL 289575 (S.D.N.Y. 2005)

o *Iroquois Master Fund v. CEL-SCI Corporation* - presided over settlement of action alleging that private placement of common stock and warrants triggered price protection and anti-dilution provision in Securities Purchase Agreement

o *Ambac Assurance v. EMC Mortgage Corp.* - supervised pretrial activity in action for breaches of warranties and representations in insurance and indemnity agreements related to mortgage backed securities

o *Aon Financial Corp. v. Societe Generale* - supervised pretrial activity in complex commercial case involving a surety bond on a loan guarantee, indemnification, and credit default swap

o *Dubai Islamic Bank v. Citibank* - supervised pretrial activity and addressed complex privilege issues in action by foreign bank asserting money laundering violations, RICO violations, breach of fiduciary duty, fraud, and negligence that resulted in the loss of over $150 million - see decision at 2000 WL 1159699 (S.D.N.Y. 2002)

o *FDIC v. Bober* - presided over settlement of FDIC receivership action against former bank directors for breach of fiduciary duty and negligence

o *SEC v. Wextrust Partners, Wextrust Capital, Byers* - presided over settlement of claims by bankrupt entities' receiver against law firm that provided counsel to entities that defrauded investors

o *United States Commodities Futures Exchange v. Optiver* - presided over settlement of action brought by the United States Commodities Futures Exchange for alleged price manipulation in heating fuel market

o *FTR Consulting Group v. Advantage Fund II Ltd.* - presided over settlement of derivative action alleging improper short-swing trading in common stock of medical research company - see decision at 2005 WL 2234039

o *DLJ Mortgage Capital and Credit Suisee First Boston v. ACT Lending Corp. d/b/a/ American Capital Mortgage* - determined damages of over $41 million in action for breach of mortgage loan repurchase agreement

o *Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank* - supervised pretrial activity and presided over settlement of action for breach of contract relating to international currency swap transactions and default valuations

o *Pin Financial LLC v. Wentworth Energy Inc.* - presided over settlement of action for breach of Private Placement Agreement related to securing capital investors

o *Ingersoll-Rand Co. v. CNA Insurance Co.* - presided over settlement of action seeking declaration of excess liability insurance for defense and indemnity

costs for asbestos-related litigation

- **Fair Labor Standards Act**
  - *Scott v. City of New York* - supervised pretrial activity in class action on behalf of over 15,000 New York City Police Department police officers and detectives claiming the right to overtime pay under the FLSA
  - *Mullins v. City of New York* - supervised pretrial activity in class action on behalf of several thousand police sergeants in the City of New York seeking overtime pay under the FLSA
  - *Benavidez v. Plaza Mexico, Inc.* - presided over collective action against restaurant chain for employee claims to overtime and tip payments under the FLSA and New York and New Jersey law - see *Benavidez v. Plaza Mexico Inc.*, 2012 WL 500428 (S.D.N.Y. 2012)
  - *Vaicaitiene v. Partners in Care and the Visiting Nurse Service of New York* - presided over settlement of collective action for overtime wages under the FLSA, on behalf of approximately 650 home health aides
  - *Patel v. Baluchi's Indian Restaurant* - supervised pretrial activity and presided over settlement of collection action on behalf of restaurant workers in chain of Indian restaurants
  - *Gersten v. Deloitte & Touche* - supervised pretrial activity in nationwide class action on behalf of auditors in accounting industry seeking overtime pay
  - *Hart v. Rick's Cabaret* - supervised pretrial activity in class action on behalf of over 1,000 entertainers in adult clubs seeking overtime pay under the FLSA
- **Labor/Employment/ERISA**
  - *In re JP Morgan Chase Retirement Plan* - presided over settlement of consolidated ERISA and age discrimination class actions, also alleging breach of fiduciary duty, on behalf of over 100,000 class members challenging substantive amendments and notices of amendments of retirement plans of predecessor, merged banks
  - *Levin v. Raynor* - supervised pretrial activity and presided over settlement of class action brought by former officers of ILGWU, against successor-union, challenging loss of life insurance benefits under ERISA - see decisions at 2008 WL 4449457, 2010 WL 2106037
  - *Adler v. Raynor* - supervised pretrial activity and presided over settlement of ERISA action alleging breach of fiduciary duty by administrators of union retirement plans and dispute between original and successor union with regard to ownership of union assets - see decisions at 2011 WL 5024412, 2012 WL 500428
  - *EEOC v. Bell Atlantic* - supervised settlement of claims on behalf of a large class of female employees whose retirement service credit was adversely affected by discriminatory maternity leave policy
  - *National Association of Letter Carriers v. U.S. Postal Service* - presided over settlement in class action brought on behalf of thousands of postal workers claiming improper use of confidential medical information in investigating disciplinary infractions
- **Intellectual Property/Entertainment**
  - *JA Apparel v. Joseph Abboud* - presided over pretrial activity and trial in action involving trademark infringement, asset sale, and alleged breach of asset purchase agreement - see *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294 (S.D.N.Y. 2010)
  - *Arista Records v. Usenet* - supervised pretrial activity, ruled on complex spoliation motion, and determined $6.5 million damage award in copyright infringement action relating to USENET (worldwide electronic bulletin board system)
  - *Pure Power Boot Camp v. Warrior Fitness Boot Camp* - presided over pretrial activity and trial in action alleging trade dress infringement, unfair competition, breach of a non-compete agreement, breach of fiduciary duty, breach of loyalty, theft of trade secrets, and defamation, against former employees who established a competing business - see *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Pure Power Boot Camp v. Warrior Fitness Boot Camp, LLC*, 587 F. Supp. 2d 548 (S.D.N.Y. 2008) (finding that theft of emails constituted a violation of the Stored Communications Act and imposing sanction of preclusion)
  - *Raymond Weil v. Charleze Theron* - presided over settlement of alleged breach of media advertising contract between renowned watch company and celebrity
  - *Maharishi Hardy Blechman v. Abercrombie & Fitch* - presided over settlement of trademark infringement action in the fashion industry
  - *Malletier v. Dooney & Bourke* - supervised pretrial activity and presided over

settlement proceedings in trademark infringement action in the fashion industry
- *Geliman v. Design Ideas* - supervised pretrial activity and presided over settlement in international trademark infringement/contract dispute over licensing of mark
- *Cartier Intl. v. St. Moritz Watch Co.* - presided over settlement proceedings in trademark infringement action
- *Aedes de Venustas v. Venustas Intl.* - presided over settlement of trademark dispute in the perfume industry
- *The Jane Goodall Institute v. Sprout Foods* - presided over settlement of action alleging breach of contract with respect to licensing of trademark
- *AG Fur Atherische Ole & Wella v. Gucci America* - supervised pretrial activity in action arising out of an international trademark licensing agreement for manufacture and distribution of fragrance and cosmetics products, where sales in gray market were alleged - see *AG Fur Atherische Ole v. Gucci America, Inc.*, 2006 WL 838996 (S.D.N.Y. 2006)
- *Sandata Technologies v. Infocrossing* - supervised pretrial activity in patent infringement action alleging infringement of patent for tracking hours of home care employees
- *UMG Recordings, Inc. v. Select-o-Hits, Inc.* - supervised pretrial activity and determined damages in action for copyright and trademark infringement in distribution of recorded music
- *SOHK Sportswear v. K.S. Trading Corp.* - presided over pretrial activity and settlement of copyright and trademark infringement action relating to use of cartoon characters on sportswear - see decision at 2003 WL 22208352
- *Calvin Klein Jeanswear v. Tunnel Trading* - presided over action and settlement involving alleged sale of counterfeit goods - see decision at 2001 WL 1456577
- *Bill Graham Archives v. Dorling Kindersley Ltd.* - supervised pretrial activity and addressed attorney's fee issue in action involving alleged copyright infringement and fair use of Grateful Dead images
- *Versace v. Gianni Versace* - supervised pretrial activity and settlement discussions in case involving trademark infringement, unfair competition, trademark dilution - see decision at 2002 WL 54610
- *Troll Company v. Century Novelty* - presided over settlement of copyright infringement action involving world famous "Good Luck Troll Doll"
- *Cartier v. Montroyal LLC* - presided over settlement of action for alleged trademark infringement of famous Cartier tank watch
- *Rug Co. v. ABC Carpet* - presided over settlement of action alleging copyright infringement of rug designs
- *Miroglia s.p.a. v. Morgan Fabrics Corp., Costco, R & M Industries, Inc.* - presided over settlement of copyright infringement action related to fabric design
- *Cartier v. B. Gray Jewelers* - presided over settlement of trademark infringement and dilution action involving on-line sales of altered Cartier watches
- *Yngwie Malmsteen v. Cleopatra Records* - presided over settlement of action by composer and recording artist for copyright infringement and unjust enrichment relating to the use of his name and image
- *Moderne Welt Tourneed v. Cyndi Lauper* - presided over settlement of action seeking damages for concert cancellations

- **Real Estate/Construction**
  - *Leslie Dick v. George Soros, Conseco Inc., Vornado Realty Trust, et al.* - supervised pretrial activity in action by unsuccessful bidder for the General Motors Building, alleging money laundering, fraud, bid-rigging, RICO violations - see decision at 2009 WL 2190207 (motion to disqualify counsel)
  - *Sheldon Solow v. Conseco Inc.* - supervised pretrial activity in action involving claim by real estate developer/builder that auction for the sale of the General Motors Building was a sham - see *Solow v. Macklowe Properties, Conseco Inc. et al.*, 2007 WL 1599151 (S.D.N.Y. 2007)
  - *Traveler's Casualty and Surety Co. v. Dormitory Authority of New York* - presided over pretrial activity and settlement of complex, consolidated actions involving alleged construction defects in a building constructed for the City University of New York
  - *Underpinning & Foundation Skanska, Inc. v. Travelers Casualty & Surety Co.* - presided in action seeking payment under a Payment Bond for work performed on a construction project - see 726 F. Supp. 2d 339 (S.D.N.Y. 2010)

- **Antitrust**
  - *Medical Diagnostic Imaging, PLLC, et al. v. Carecore National, LLC, et al.*

*Alpha Imaging Consultants v. Carecore National LLC*
*Parkwest Radiology v. Carecore National LLC* – supervised pretrial activity and presided over settlement discussions in consolidated actions alleging antitrust violations by health benefits company coordinating radiology services for insurance companies - see *Medical Diagnostic Imaging, PLLC v. CareCore Nat., LLC*, 542 F. Supp. 2d 296 (S.D.N.Y. 2008)

- **Mass and Complex Torts**
  o *In re Ski Train Fire in Kaprun Austria* - supervised pretrial activity and settlement discussions in mass tort action brought by relatives of American and foreign-nation citizens who were killed in a fire in a ski tunnel in Austria
  o *Knox v. Palestine Liberation Organization* - presided over damages hearing on behalf of family of Israeli/American citizen murdered by agents of the PLO, brought under the Anti-Terrorism Act of 1990, awarded over $192 million in damages - see *Knox v. Palestinian Liberation Organization*, 2009 WL 591404 (S.D.N.Y. 2009)
  o *September 11 Litigation* - addressed issues related to families of September 11 victims' failures to file Notices of Claims against the Port Authority of New York and New Jersey and tolling of the statute of limitations

- **Government Regulation**
  o *Natural Resources Defense Council v. United States Food and Drug Administration* - presiding judge in action brought to compel the United States Food and Drug Administration to withdraw approval of use of antibiotics to promote growth in poultry and farm animals - see *Natural Resources Defense Council, Inc. v. U.S. Food and Drug Admin.*, 2012 WL 983544 (S.D.N.Y. 2012)
  o *Morel v. Guiliani* - presided over settlement of class action on behalf of thousands of New York City public benefits recipients seeking a hearing prior to the termination of their benefits
  o *Hercules v. Doar* - presided over settlement of class action on behalf of public benefits recipients who received defective notices with respect to the suspension of their benefits

- **Civil Rights**
  o *McBean v. City of New York* - supervised pretrial activity in class action challenging strip searches of thousands of people arrested in New York City
  o *Wise v. Kelly & City of New York*
  o *Casale v. City of New York* - presided over settlement of attorneys' fees and injunctive and monetary class-wide relief in action brought on behalf of thousands of people arrested under a New York City loitering statute that had been declared unconstitutional

**Honors, Memberships, and Professional Activities**

- Recipient, Fortune Society's Helen L. Buttenweiser Award
- Adjunct Faculty, Columbia Law School
- Member, U.S. District Court, Southern District of New York Committees on Alternative Dispute Resolution, Judicial Improvements, Pro Se Litigation
- Member, U.S. District Court, Advisory Panel that Developed Pilot Project Regarding Case Management of Complex Civil Cases

**Background and Education**

- U.S. Magistrate Judge, U.S. District Court, Southern District of New York, 1991-2012 (Served as Chief Magistrate Judge)
- Director, Prisoners' Rights Project of the Legal Aid Society
- Law Clerk to the Hon. Robert L. Carter, United States District Judge
- J.D., Columbia Law School, 1973 (Editor, *Columbia Law Review*; Harlan Fiske Stone Scholar)
- B.A., *magna cum laude*, Brandeis University, 1968

# EXHIBIT J

JAMS ARBITRATION
NO. 1425011630

| | |
|---|---|
| MISS UNIVERSE L.P., LLPP, | X |
| Claimant, | X |
| | X |
| | X |
| | X |
| AND | X |
| | X |
| | X |
| SHEENA MONNIN, | X |
| Respondent. | X |
| | X |
| | X |

## REPORT OF PRELIMINARY CONFERENCE AND SCHEDULING ORDER NO. 1

A preliminary conference in this matter was conducted on September 14, 2012. Respondent's counsel, Richard F. Klineburger, III, was provided notice of the conference on several occasions. Nevertheless, he failed to participate in the conference and the conference proceeded in his absence. In addition, Respondent Sheena Monnin failed to respond to the Statement of Claim, notwithstanding the fact that she was given an additional opportunity to do so after counsel appeared on her behalf. Counsel's only substantive submission on Respondent's behalf has been a brief letter, dated July 18, 2012, in which he states that his client is not subject to any arbitration provision and that she will not participate in any JAMS arbitration proceedings. The Hearing will therefore proceed in Respondent's absence.

The following order is made respecting the conduct of this arbitration:

1. **Parties and Counsel.** The parties to the arbitration are identified in the caption and are represented as follows:

Scott S. Balber
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 1001
(212) 408-5100
sbalber@chadbourne.com
Counsel for Claimant

Richard F. Klineburger, III
Klineburger & Nussey
1313 Race Street
Philadelphia, PA 19107
(215) 568-5155
Counsel for Respondent

2. **Arbitrator.** The arbitrator who has been appointed is:

Theodore H. Katz
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
212-751-2700
tkatz@jamsadr.com

3. **Case Manager.**

Monica D. Veglia
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
(212)  607-2791
Fax - (212) 751-4099
mveglia@jamsadr.com

4. **Agreement to Arbitrate.**

The parties entered into an ENTRY FORM/CONTRACT, signed by Respondent on December 4, 2011 and accepted and agreed to by Claimant on February 7, 2012. The CONTRACT contains an arbitration clause at paragraph 22.

5. **Applicable Law and Rules.**

The arbitrator shall apply the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2. The applicable substantive law is the law of New York.

6. **Claims of the Parties.**

Claimant's Demand for Arbitration is dated June 25, 2012.

The claims are arbitrable.

7. **Discovery.**

The parties may exchange Requests for Documents and shall respond to any such Requests and produce all responsive, non-privileged documents within fourteen (14) days of service of a Request. All discovery shall be completed by October 22, 2012.

8. **Hearing.**

The Hearing in this matter shall take place on **November 5, 2012**, commencing at 10:00 A.M. at the JAMS Resolution Center at 620 Eighth Avenue, New York, New York. All issues, including liability, damages, injunctive and other relief, and of any entitlement to costs and/or attorneys' fees, shall be addressed at the Hearing. Pre-Hearing memoranda (addressing all Hearing issues), pre-marked exhibits, and a witness list shall be filed by **October 26, 2012**. All witnesses, including party-witnesses, shall be identified in the witness list, and any witness who is not so-identified shall not be permitted to testify at the Hearing. The parties shall arrange for the transcription of the Hearing.

9. **Cancellation.**

The parties are reminded to acquaint themselves with the JAMS cancellation policies involving the payment of arbitrator fees and expenses in the event a hearing is cancelled.

Dated: September 19, 2012

THEODORE H. KATZ
ARBITRATOR

**PROOF OF SERVICE BY FACSIMILE, EMAIL, & U.S. MAIL CERTIFIED**

Re: Miss Universe L.P., LLLP vs. Monnin, Sheena
Reference No. 1425011630

I, MONICA D. VEGLIA, not a party to the within action, hereby declare that on September 19, 2012 I served the attached REPORT OF PRELIMINARY CONFERENCE AND SCHEDULING ORDER NO. 1 on the parties in the within action by facsimile, email and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Scott S. Balber Esq.
Ms. Lisa Schapira
Chadbourne & Parke
30 Rockefeller Plaza
New York, NY 10112
Tel: 212-408-5100
Email: sbalber@chadbourne.com
LSchapira@chadbourne.com
   Parties Represented:
   Miss Universe L.P., LLLP

Ms. Andrea E. Berner
Miss Universe L.P., LLP
1370 Avenue of the Americas
16th Fl.
New York, NY 10019
Tel: (212) 373-4875
Email: aberner@missuniverse.com
   Parties Represented:
   Miss Universe L.P., LLLP

Richard F. Klineburger III Esq.
Klineburger & Nussey
1313 Race Street
Philadelphia, PA 19107
Tel: 215-568-5155
Email: rfk@klineburgerandnussey.com
   Parties Represented:
   Sheena Monnin

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on September 19, 2012.

MONICA D. VEGLIA
JAMS The Resolution Experts

# EXHIBIT K



**THE RESOLUTION EXPERTS**

## NOTICE OF HEARING

NOTICE TO ALL PARTIES                                        September 17, 2012

        Re:    Miss Universe L.P., LLLP vs. Monnin, Sheena
               Reference #: 1425011630

Dear Parties:

Thank you for choosing JAMS as your dispute resolution provider.  This letter will confirm the arbitration hearing in the above-referenced matter has been scheduled as follows:

        Date:              November 5, 2012 at 10:00 AM for 8 hours

        Place:             JAMS
                           620 Eighth Ave.
                           34th Floor
                           New York, NY 10018

        Neutral:           Hon. Theodore H. Katz (Ret.)

If monies are outstanding, enclosed is an invoice for your share of the fees.  All fees must be paid by 10/6/12 to proceed with the above hearing.  Please remit payment to JAMS, P.O. Box 512850, Los Angeles, CA 90051-0850.

If additional fees are incurred an invoice will be sent after the hearing.  All fees must be paid prior to service of an award which the Arbitrator has rendered.

Any cancellation or continuance must be approved by the arbitrator.  If reserved time is canceled or continued by any party after 10/6/12 JAMS will make every attempt to reschedule the neutral's time with another matter.  However, if JAMS cannot reschedule, the party canceling or continuing the hearing is responsible for all fees associated with the reserved time.

Pre-hearing materials may be submitted directly to the arbitrator according to your briefing schedule.  If you have any questions, please contact me directly at 212-607-2791.  We look forward to working with you.

Very truly yours,

Monica Veglia
Case Manager
mveglia@jamsadr.com

# SERVICE LIST

| | |
|---|---|
| **Case Name:** Miss Universe L.P., LLLP vs. Monnin, Sheena | **Hear Type:** Arbitration |
| **Reference #:** 1425011630 | **Case Type:** Business/Commercial |
| **Panelist:** Katz, Theodore H., | |

---

## Scott S. Balber

Chadbourne & Parke
Scott S. Balber
30 Rockefeller Plaza
New York, NY  10112
sbalber@chadbourne.com

Claimant
Phone: 212-408-5100
Fax: 646-710-5466

**Party Represented:**
Miss Universe L.P., LLLP

## Andrea E. Berner

Miss Universe L.P., LLP
Andrea E. Berner
1370 Avenue of the Americas
16th Fl.
New York, NY  10019
aberner@missuniverse.com

Claimant
Phone: (212) 373-4875
Fax: (646) 792-4755

**Party Represented:**
Miss Universe L.P., LLLP

## Richard F. Klineburger III

Klineburger & Nussey
Richard F. Klineburger III
1313 Race Street
Philadelphia, PA  19107
rfk@klineburgerandnussey.com

Respondent
Phone: 215-568-5155
Fax: 215-568-1522

**Party Represented:**
Sheena Monnin

## Lisa  Schapira

Chadbourne & Parke
Lisa  Schapira
30 Rockefeller Plaza
New York, NY  10112
LSchapira@chadbourne.com

Claimant
Phone: 212-408-5100
Fax: 212-541-5369

**Party Represented:**
Miss Universe L.P., LLLP

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Miss Universe L.P., LLLP vs. Monnin, Sheena
Reference No. 1425011630

I, Alicia Grant, not a party to the within action, hereby declare that on September 17, 2012 I served the attached Proof of Service on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Scott S. Balber Esq.
Ms. Lisa Schapira
Chadbourne & Parke
30 Rockefeller Plaza
New York, NY   10112
Phone: 212-408-5100
sbalber@chadbourne.com
LSchapira@chadbourne.com
    Parties Represented:
    Miss Universe L.P., LLLP

Ms. Andrea E. Berner
Miss Universe L.P., LLP
1370 Avenue of the Americas
16th Fl.
New York, NY   10019
Phone: (212) 373-4875
aberner@missuniverse.com
    Parties Represented:
    Miss Universe L.P., LLLP

Richard F. Klineburger III Esq.
Klineburger & Nussey
1313 Race Street
Philadelphia, PA   19107
Phone: 215-568-5155
rfk@klineburgerandnussey.com
    Parties Represented:
    Sheena Monnin

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on  September 17, 2012.

Alicia Grant
agrant@jamsadr.com



**THE RESOLUTION EXPERTS**

## Via Fax Only

NOTICE TO ALL COUNSEL
(Please see fax cover sheet)

Re:  Miss Universe L.P., LLLP vs. Monnin, Sheena
Ref. No.: 1425011630
Session Time: November 5, 2012 at 10:00 AM for 8 hours

Dear Counsel:

The security personnel at JAMS 620 Eighth Ave., 34th Floor, New York, NY 10018 have requested that
we provide a list of all persons who will be visiting our office during the day at the soonest available
opportunity.  Presenting the list in advance ensures that visitors will be admitted promptly and with
minimal screening.   Therefore, we will appreciate your assistance in providing a list of all persons you
expect will attend the hearing that is scheduled in the above-referenced matter.

Please review the attached service list and provide additional names of attendees not on the list.  Please
fax this form to my attention at your earliest convenience. My fax number is: 212-751-4099.

Please print:

1.)_____      6.)_____

2.)_____      7.)_____

3.)_____      8.)_____

4.)_____      9.)_____

5.)_____      10.)_____

Thank you for your cooperation.

Monica Veglia
Case Manager
mveglia@jamsadr.com
Fax# 212-751-4099



THE RESOLUTION EXPERTS

Dear Valued Client,

As a guest to JAMS, I would like to welcome you to our facility and provide a few helpful pieces of information to ensure your visit goes smoothly:

- **Parking**
  JAMS has a 50% discount for clients who park at **Central Parking Garage** – located at 252 W. 40th St. between 7th and 8th Avenues (south side). The discounted rate is $15.00 (tax included) for up to 12 hours (7 days). Oversize SUVs are subject to an additional charge of $10.00 (tax included). Clients who park here will be issued a standard claim check upon check in, which you would then validate at the JAMS reception desk. Once validated, you may present the claim check to the parking garage attendant in order to claim the JAMS 50% discount.

- **Public Transportation**
  Our Resolution Center is conveniently located in the Times Square area, which is centrally located in Manhattan and can be located via virtually all subway lines. We are directly across the street from the **Port Authority Bus Terminal, 7 blocks from Penn Station** and near the A, C, and E (42nd St. – **Port Authority Bus Terminal**) subway station. For more information please visit http://www.mta.info/nyct/

- **Hotel Accommodations**
  JAMS is pleased to announce that we have corporate rates at four hotels near our Resolution Center. Instructions for reserving rooms at these corporate rates are contained on the attached Annex.

- **Business Center**
  We offer a business center equipped with computers and a printer. Our fax number (Reception) is (212) 801-1743. Our facility offers a complimentary wireless network for your laptop. There are Ethernet telephones in all conference rooms with speakerphone and conferencing capabilities. All phone calls (local and long distance) are complimentary. Please dial 1, the area code and the phone number when placing a call. Our front desk associates are also available to assist you with any printing or faxing needs.

We hope you enjoy your visit and look forward to seeing you again in the future.

David E. Alpine
Assistant Manager-Facility & Administration
(212) 751-2700



**THE RESOLUTION EXPERTS**

## ANNEX -- JAMS CORPORATE RATES 2012

| Hotel (Traditional/Standard Accommodations) | Jan -- March | March -- June | July -- Sept. | Sept. -- Dec. |
|---|---|---|---|---|
| *YOTEL New York* 570 Tenth Avenue (at W 42nd St.) New York, NY 10036 T 877-909-6835 (reservations) Please be sure to designate your affiliation with JAMS at the time of reservation to ensure the JAMS preferred rate is applied. *Please note that blackout dates may apply and rates can vary.* | $169* | $249* | $199* | $289* |
| *Hilton Times Square* 234 West 42nd Street New York, NY 10036 T 800-445-8667 (reservations) Please be sure to designate your affiliation with JAMS at the time of reservation by providing Corporate ID: N9883205 and Hotel Code: NYCTS. *Please note that blackout dates may apply and rates can vary.* | $210* | $359* | $299* | $409* |
| *Intercontinental New York Times Square* 300 West 44th Street New York, NY 10036 T 800-383-5430 (reservations) Please be sure to ask specifically for the "JAMS preferred corporate rate". *Please note that blackout dates may apply and rates can vary.* | $259* | $359* | $319* | $449* |
| *The Westin New York at Times Square* 270 West 43rd Street, at 8th Avenue New York, NY 10036 T 800-937-8461 (reservations). Please be sure to request the "JAMS rate". *Please note that blackout dates may apply and rates can vary.* | $279* | $389* | $329* | $489* |

| Form **W-9** (Rev. January 2011) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | Give Form to the requester. Do not send to the IRS. |

Name (as shown on your income tax return)

JAMS, Inc.

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification (required):
☐ Individual/sole proprietor   ☐ C Corporation   ☑ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

P.O. Box 512660

City, state, and ZIP code

Los Angeles, CA 90051

Requester's name and address (optional)

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number: [ ][ ][ ] - [ ][ ] - [ ][ ][ ][ ]

Employer identification number: 6 8 - 0 5 4 2 6 9 8

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here   Signature of U.S. person ▶ _Julie Anger_   Date ▶ _January 3, 2011_

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X                    Form **W-9** (Rev. 1-2011)



# Document Retention Policy

THE RESOLUTION EXPERTS®

Please note that <u>30 CALENDAR DAYS after termination of any case JAMS will</u> <u>destroy the following documents</u> submitted by parties unless parties specifically notify JAMS that they wish to collect their documents:

- Briefs
- Exhibits
- Evidence.
- Transcripts

Parties should collect their documents as soon as possible after the termination of a case. Otherwise, they will be destroyed 30 days thereafter. Please note that JAMS does not maintain a duplicate file of documents, which are normally forwarded to the Neutral upon receipt. Any items marked with notes, comments or suggestions by the Neutral will automatically be destroyed upon closing of the file.

"Termination" of a case is defined as any of the following:

- Resolution of a matter, e.g., either through settlement or issuance of an award
- Mutual agreement to close the matter
- Withdrawal from ADR Process
- Time Period of one year elapses without any resolution and no future dates on calendar
- Notice from JAMS that the matter has been terminated

# EXHIBIT L

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100 fax (212) 541-5369

# CHADBOURNE & PARKE LLP

Scott S. Balber
direct tel 212-408-5466
sbalber@chadbourne.com

September 21, 2012

**BY OVERNIGHT DELIVERY**

Richard F. Klineburger, III
1313 Race Street
Philadelphia, PA 19107

Re: Miss Universe L.P., LLLP v. Sheena Monnin (JAMS Case No. 1425011630)

Dear Mr. Klineburger:

This firm represents Miss Universe L.P., LLLP, in connection with the JAMS arbitration proceeding before the Honorable Theodore H, Katz. Pursuant to Arbitrator Katz's Scheduling Order No. 1, a copy of which is enclosed with this letter, the parties are to proceed with discovery. As such, please find enclosed document requests directed to Sheena Monnin.

Very truly yours,

Scott S. Balber



JAMS – NEW YORK, NEW YORK

---

MISS UNIVERSE L.P., LLLP,

            Claimant,

-against-

SHEENA MONNIN,

            Respondent.

JAMS Case No. 1425011630

---

## CLAIMANT'S DOCUMENT REQUESTS

Pursuant to the September 18, 2012 Order from Arbitrator Theodore H. Katz, claimant Miss Universe L.P., LLLP ("Claimant") hereby requests that respondent Sheena Monnin ("Respondent") provide the following documents and information within fourteen (14) days from the service of these requests:

## DEFINITIONS AND INSTRUCTIONS

A.    "Pageants" means the Miss USA Pageant, the Miss Pennsylvania USA Pageant, the Miss Universe Pageant, the Miss Universe Canada Pageant, the Miss Teen USA Pageant or the Miss Pennsylvania Teen USA Pageant.

B.    "Communication" means the transmittal of information in any form.

C.    "Concerning" or "Regarding" means discussing, describing, supporting, referencing, relating to, pertaining to, containing, analyzing, studying, reporting on, commenting on, evidencing, setting forth, considering, recommending, consisting of, or constituting, in whole or in part.

D.      "Document" is defined to include any type of written, typewritten, printed, recorded, computer generated or graphic materials, however produced or stored, calendars, charts, checks, computer files, e-mails, text-messages, WebPages, posts on websites, facsimile transmissions, graphs, journals, letters, memoranda, notes, projections, spreadsheets, summaries or records of telephone or in person communications, voice-mail and all other media of electronic information storage and communication.  A draft or non-identical copy or copy with marginalia, notes, comments or annotations of any kind is a separate document within the meaning of this term.

E.      Any word written in the singular herein shall be construed as plural or vice versa as necessary in order to bring within the scope of the discovery request all responses which otherwise might be construed to be outside its scope.

F.      "And," "or," as well as "and/or," shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the discovery request all responses which otherwise might be construed to be outside its scope.

G.      In producing documents and things responsive to these requests, Respondent shall furnish all documents within her possession, custody, or control, regardless of whether these documents are possessed directly by Respondent or her agents, representatives, relatives, or attorneys.

H.      If any document whose production is called for by this request is not produced on the basis of an assertion of the attorney-client privilege, the work product doctrine or any other claim of privilege or immunity, identification of each such document is required, together with sufficient information to permit other parties to make a determination as to whether Respondent has a proper basis for withholding such document.  In so doing, Respondent must supply the following information in writing:  (a) the type of document (e.g., letter, memorandum, report, e-

2

mail, etc.); (b) the general subject matter of the document; (c) the date of the document; (d) the author or sender of the document; (e) the addressee or recipient of the document; (f) each person who received a copy of the document; and (g) the privilege, doctrine or immunity asserted.

I.       If Respondent maintains that any document or thing requested by Claimant has been destroyed, set forth the contents of the document or thing, the date of its destruction, the name of the person who destroyed it, and the name of the person who authorized its destruction.

## DOCUMENT REQUESTS

1.       All documents evidencing statements made by Sheena Monnin on or after November 8, 2011, regarding the Pageants, the Miss Universe Organization, Miss Universe L.P., LLLP, NBC Universal, Inc., NBC West, LLC, and NBC Pageants Inc., Donald Trump, Trump Pageants, Inc., or the Trump Organization.

2.       All documents, including email, correspondence and text messages, sent by Sheena Monnin, on or after November 8, 2011, to anyone regarding the Miss USA Pageant, the Miss Pennsylvania USA Pageant or the participation of transgendered contestants in the Pageants.

3.       All documents, including email, correspondence and text messages, sent by Sheena Monnin, on or after November 8, 2011, to anyone regarding her reign as Miss Pennsylvania USA.

4.       All documents, including email, correspondence and text messages, received by Sheena Monnin, on or after November 8, 2011, regarding the Miss USA Pageant or the participation of transgendered contestants in the Pageants.

5.     All posts, including replies to other posts, made by Sheena Monnin on Facebook, Twitter, myspace.com or any other social media forum, blog or website, on or after November 8, 2011, regarding the Miss USA Pageant, or the participation of transgendered contestants in the Pageants.

6.     Any diary or notebooks reflecting entries made by Sheena Monnin that relate to the Miss USA Pageant or the participation of transgendered contestants in the Pageants.

7.     All documents reflecting communications with media outlets by Sheena Monnin, or anyone acting on Sheena Monnin's behalf, regarding the Pageants, including but not limited to copies of written articles, blogs, transcripts, or video.

8.     Documents sufficient to show any payments received by Sheena Monnin for any interview or statement she gave regarding the Pageants.

9.     All documents or information supporting Sheena Monnin's belief that the finalists of the 2012 Miss USA Pageant were determined before the final show aired on June 3, 2012.

Dated:  September 21, 2012

CHADBOURNE & PARKE LLP

By: _____
        Scott S. Balber
        30 Rockefeller Plaza
        New York, NY  10112
        (212) 408-5100
        Sbalber@chadbourne.com
        Attorneys for Claimant
        Miss Universe L.P., LLLP

4

## PROOF OF SERVICE

I, the undersigned, hereby certify that I am a citizen of the United States, over the age of 18, and am not a party this action. My business address is 30 Rockefeller Plaza, New York, NY 10012. I am readily familiar with my employer's practice of collection and processing of documentation for mailing. On the date listed below, following ordinary business practice, I served the following documents:

1.    CLAIMANT'S DOCUMENT REQUESTS

2.    REPORT OF PRELIMINARY CONFERENCE AND SCHEDULING ORDER NO 1.

These documents were served on the parties to this action, by enclosing true and correct copies in a sealed envelope as follows:

> Richard F. Klineburger, III
> 1313 Race Street
> Philadelphia, PA 19107
> Tel: (212) 568-5155
> Fax: (212) 5681522
> Counsel for Sheena Monnin

These documents were served as follows:

(X) By Overnight Delivery:  I caused such envelope to be delivered to the office of the addressee(s) by overnight delivery via Federal Express.

I declare under penalty of perjury under the laws of the State of New York, that foregoing is true and correct.

Dated: September 21, 2012                          By: _____
                                                        Lisa Schapira

5

# EXHIBIT M

JAMS – NEW YORK, NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

MISS UNIVERSE L.P., LLLP,

                   Claimant,               JAMS Case No. 1425011630

           -against-

SHEENA MONNIN,

                 Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## CLAIMANT MISS UNIVERSE L.P., LLLP'S PRE-HEARING MEMORANDUM

## PRELIMINARY STATEMENT

This case arises out of Respondent Sheena Monnin's malicious, false, and defamatory statements made against Claimant Miss Universe L.P., LLLP, also known as the Miss Universe Organization ("MUO"). Monnin, unhappy after failing to advance beyond the preliminary round in the 2012 Miss USA Pageant, and upset about MUO's prior decision to change its rules to allow transgendered persons to enter its competitions, relinquished her title as Miss Pennsylvania USA 2012 on June 4, 2012, the day after the Miss USA Pageant concluded. Later that same day, Monnin, through public statements made on her Facebook profile, launched a campaign to assail the integrity of MUO. Monnin's Facebook posts on June 4 and June 5 falsely alleged that the Miss USA Pageant had been "rigged" and that MUO was "fraudulent" and "dishonest." Just days later, Monnin repeated her unfounded accusations on national television, even in the face of evidence that her statements regarding MUO could not possibly be true. Monnin launched her campaign with intent to harm MUO's reputation and standing as a pageant organization. Unfortunately, Monnin's crusade has been successful. As a result of Monnin's defamatory claims, MUO has been thrust into scandal and disgrace, and has suffered harm to its public status, business relationships, and financial interests. MUO now brings this proceeding in arbitration in an effort to vindicate its reputation against Monnin's baseless, spiteful, and derogatory statements.

## STATEMENT OF FACTS

The Miss Universe Organization, with a history dating back to 1952, produces the internationally-recognized Miss Universe, Miss USA, and Miss Teen USA competitions, and sanctions state-level pageants as well as pageants in other nations around the world. The finals of

the Miss USA and Miss Universe Pageants are nationally-televised live events that receive a great deal of media and public attention and consistently rank among the most-watched television programming in the world. The winner of an MUO-sanctioned state-level pageant earns the title "Miss [State] USA [Year]" and the right to compete in the national competition for the title of "Miss USA [Year]". The winner of the Miss USA competition then goes on to compete against winning contestants from other nations in the global Miss Universe Pageant.

### 1. The Miss USA Pageant is a Judged Competition.

The Miss USA Pageant consists of a preliminary competition and a final competition. In the preliminary competition, all fifty-one Miss USA contestants compete in swimsuit, evening gown, and interview events.[1] Each member of a preliminary panel of judges—comprised of industry experts including fashion editors, television producers, PR professionals, and the like—votes for his or her top ten contestants during these events. In the final competition, which is the televised event popularly considered to be the Miss USA Pageant, sixteen semifinalists are announced (the fifteen competitors who receive the most votes from the preliminary competition, plus one audience selection); these semifinalists then go on to compete before a panel of celebrity judges in a swimsuit competition. The judges assign a score to each contestant, and the ten contestants with the best scores are then judged in the evening gown competition. After the evening gown and swimsuit scores are finalized, the five highest-scoring semifinalists become finalists and compete in an interview segment before the judges to determine the new Miss USA. Contestants who do not qualify as semifinalists take the stage in portions of the show, but do not compete in scored events during the televised final competition. The panel of judges for the final competition is comprised of celebrities and is traditionally different than the panel of judges from

---

[1] Fifty states, plus Washington D.C., each send a competitor to the Miss USA Pageant.

the preliminary competition.[2]  At each stage of the competition, the judges' scores are tabulated and audited by the independent accounting firm Ernst & Young through a rigorous, secure, and tamper-proof process.  The results of each scoring round are transmitted directly from the judges' table to the production supervisor in the "production truck," placed by Ernst & Young representatives into a sealed envelope, and are unknown to any other person until announced live on stage at the competition within minutes after the tabulation of the scores.

### 2. MUO Altered Its Eligibility Rules in April 2012 to Allow Transgendered Contestants.

Traditionally, only naturally-born females were allowed to participate in MUO's pageants.  In April 2012, amid significant controversy, MUO revised its rules and followed the Olympic model in order to permit transgendered contestants to participate in its events in countries where their status as females is legally and medically recognized.  Jenna Talackova, a transgendered person, competed in the MUO-sanctioned Miss Universe Canada Pageant in May 2012.

### 3. Respondent Sheena Monnin Resigned and Made Defamatory Statements Against MUO After Failing to Advance in the Competition.

Respondent Sheena Monnin competed in the 2012 Miss USA Pageant as Miss Pennsylvania USA 2012, a title she won in December 2011.  Monnin fully participated in the preliminary competition, and was present during the final broadcast, but did not advance into the semifinals and was therefore not an active competitor during the final competition.

After failing to advance in the competition, Monnin became disgruntled.  During the night of the final competition, on June 3, 2012 at 9:38 p.m., Monnin sent text messages to Randy

---

[2] The panel of judges for the final competition in the 2012 Miss USA Pageant consisted of Cat Cora, Ali Fedotowsky, Arsenio Hall, Marilu Henner, Joe Jonas, Rob Kardashian, George Kotsiopoulos, and Dayana Mendoza (Miss Universe 2008)—none of whom had been a judge at the preliminary competition.

3

Sanders, Director of the Miss Pennsylvania USA Pageant, asserting that the pageant was rigged. She wrote:

> This is f-ing rigged Randy.
> Seriously? Colorado?
> South Carolina?
> I'm done. This is ridiculous.
> It's obviously rigged so the girl they want can shine; they kept
> several beautiful girls out for that reason.

Monnin resigned her title as Miss Pennsylvania USA 2012 in an email sent to Sanders the following morning. This email, sent on June 4, 2012 at 10:25 a.m., cites Monnin's objection to MUO's prior decision to allow transgendered contestants to participate in its pageants as the primary reason for Monnin's resignation. It reads:

> I am officially and irrevocably resigning the title of Miss
> Pennsylvania USA 2012. I refuse to be part of a pageant system
> that has so far and so completely removed itself from its
> foundational principles as to allow and support natural born males
> to compete in it. This goes against ever [sic] moral fiber of my
> being. I believe in integrity, high moral character, and fair play,
> none of which are part of this system any longer.

Approximately twelve hours after sending her resignation email to Randy Sanders, Monnin commenced a false and malicious public campaign impugning the integrity of MUO. At approximately 10:30 p.m. on June 4, 2012, Monnin publicly announced her resignation on the social media website Facebook, which can be found on the internet at www.facebook.com. Monnin's June 4 Facebook post (the "June 4 post") read as follows:

> I have decided to resign my position as Miss Pennsylvania USA
> 2012. Effective immediately I have voluntarily, completely, and
> utterly removed myself from the Miss Universe Organization. In
> good conscience I can no longer be affiliated in any way with an
> organization I consider to be fraudulent, lacking in morals,
> inconsistent, and in many ways trashy. I do not support this system
> in any way. In my heart I believe in honesty, fair play, a fair

4

opportunity, and high moral integrity, none of which in my opinion
are part of this pageant system any longer.

Thank you all for your support and understanding as I walk a road
I never dreamed I'd need to walk, as I take a stand I never dreamed
I'd need to take. After 10 years of competing in a pageant system I
once believed in, I now completely and irrevocably separate
myself in every way and on every level from the Miss Universe
Organization. I remove my support completely and have turned in
the title of Miss Pennsylvania USA 2012.

On June 5, Monnin continued her spiteful endeavor against MUO when she posted again

on Facebook, this time providing a different reason for her resignation—alleged fraud in the

scoring at the Miss USA Pageant.  Monnin stated in her June 5 Facebook post (the "June 5 post")

that the Miss USA Pageant had been "rigged" and was "dishonest."   The June 5 post read:

Many people have sent me messages requesting and at times
demanding that I come forward if I know information that has led
to my abrupt and surprising resignation. I agree that it is my moral
obligation to state what I witnessed and what I know to be true. I
will relay to you the reasoning behind my resignation. I witnessed
another contestant who said she saw the list of the Top 5 BEFORE
THE SHOW EVER STARTED proceed to call out in order who
the Top 5 were before they were announced on stage. Apparently
the morning of June 3rd she saw a folder lying open to a page that
said 'FINAL SHOW Telecast, June 3, 2012' and she saw the
places for Top 5 already filled in. Thinking she was just seeing a
rehearsal fake top 5 from a previous day she walked away, then
realized that it had without a doubt been labeled as the Final Show
Telecast, June 3rd. After the Top 16 were called and we were
standing backstage she hesitantly said to me and another contestant
that she knew who the Top 5 were. I said 'who do you think they
will be?' She said that she didn't 'think' she 'knew' because she
saw the list that morning. She relayed whose names were on the
list. Then we agreed to wait and see if that was indeed the Top 5
called that night. After it was indeed the Top 5 I knew the show
must be rigged; I decided at that moment to distance myself from
an organization who did not allow fair play and whose morals did
not match my own. That is all I know about this. If this contestant
would like to step forward as an eye witness and as being the one
who saw the sheet with the Top 5 already selected before the
judges ever saw the Top 16, then perhaps action can be taken. As
for me, I believe her words and I will not encourage anyone to

compete in a system that in my opinion and from what I witnessed is dishonest.

The June 5 post in particular received many comments from other Facebook users, and was shared by users across the website.  Monnin's statements received a great deal of media attention, and her false accusations were recounted in news stories around the nation.  On June 8, 2012, Monnin appeared on the popular NBC morning show "Today."  In an interview conducted by "Today" co-host Ann Curry (the "'Today' interview"), Monnin disparaged the integrity of MUO before a national television audience.  Monnin claimed that the Miss USA contestant competing as Miss Florida USA, Karina Brez, had spoken to Monnin after the sixteen semifinalists had been named, and had told Monnin that she had read a list containing "the names of the top five" finalists prior to the beginning of the final competition.  Monnin claimed that Ms. Brez had recited the names that had been on the list, and that the actual five finalists announced during the Pageant "were called out in the order that [Ms. Brez] said she saw them on the list."  When asked how she could be sure Ms. Brez had been telling the truth, Monnin stated that she had "many years of psychological training," and that she can tell when somebody is joking or being serious.  Monnin also indicated during the interview that in April 2012 she had discussed with Randy Sanders her feelings about MUO's decision to allow transgendered contestants; based on Sanders' advice, Monnin had decided in April to "continue[] to serve the title" of Miss Pennsylvania USA and she "continued to prepare for Miss USA."  Finally, Monnin stated that she believed that "what Miss Florida said is true.  There's really no doubt in my mind. It's just too, too much evidence pointing to this being fraudulent."

### 4. Monnin Is Contractually Obligated to Refrain From Disparaging MUO.

As a condition of entering an MUO-sanctioned pageant, contestants are required to submit an entry form containing binding agreements between MUO and the contestant. MUO takes great care to protect and maintain its sterling reputation as a pageant organization, and many of the provisions of the entry form contracts are meant to ensure preservation of MUO's public status.

For example, in Paragraph 5(l) of the Miss USA Pageant Entry Form, the contestant covenants that she "will not engage in any activity that might bring myself, [MUO], the Miss USA Pageant, my State Pageant, the Miss USA Pageant system, [Donald] Trump, NBC, or any of their respective subsidiaries . . . into public disrepute, ridicule, contempt or scandal or might otherwise reflect unfavorably upon any of the foregoing individuals or entities or might shock, insult or offend the community or any class or group thereof." Similarly, in Paragraph 5(a)(4) of the State Pageant Entry Form used in Pennsylvania, the contestant agrees "not to engage in any conduct, acts or omissions that may be detrimental to [the] Miss USA Pageant." Paragraph 5(b) of the Miss USA Pageant Entry Form obligates the contestant to abide by the "rules, instructions, directions and requirements" set forth in the Entry Form and the Contestant Handbook, and in Paragraph 5(f) of the same document the contestant agrees that she will not "violate the rights of any other person or entity" or "cause harm to any person . . . in connection with [her] participation in the Miss USA Pageant." Monnin submitted executed copies of both the State Pageant Entry Form and the Miss USA Pageant Entry Form, and therefore bound herself to all of the obligations contained in those documents, including the provisions cited above.

### 5. MUO Commenced This Arbitration to Vindicate Its Rights.

In a further effort to preserve its reputation in the wake of Monnin's false and malicious statements, MUO commenced the instant proceeding against Monnin pursuant to Paragraph 22 of the Miss USA Pageant Entry Form, which mandates that any dispute relating to the Entry Form or in connection with the Pageant be resolved through binding arbitration.  In an Order dated September 19, 2012, Arbitrator The Honorable Theodore H. Katz found MUO's claims to be arbitrable and the controlling law to be that of the State of New York.  Pursuant to the same Order, MUO served document requests to Monnin on September 21, 2012; as of October 26, 2012, neither Monnin nor her counsel have produced any documents or otherwise responded to MUO's requests.

## ARGUMENT

### I.    MONNIN'S STATEMENTS ARE DEFAMATORY.

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  A heightened standard applies where the party alleging harm to its reputation is a "public figure"; for purposes of this proceeding, MUO concedes that it is a public figure with regard to the statements made by Monnin.  "A public figure claiming defamation under New York law must establish that 'the statements . . . complain[ed] of were (1) of and concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice.'" *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001)).  Monnin's

statements in the June 4 post and June 5 post constitute libel, and her statements in the June 8 "Today" interview constitute slander. All three statements were defamatory.

### A. Monnin's Statements are "Of and Concerning" MUO.

The libelous and slanderous statements made by Monnin were statements "of and concerning" MUO. Monnin explicitly stated in the June 4 post that she had "utterly removed [herself] from the Miss Universe Organization" because she could "no longer be affiliated in any way with an organization [she] consider[s] to be fraudulent, lacking in morals, inconsistent, and in many ways trashy." The June 5 post relates directly back to the June 4 post, and in it Monnin stated, with regard to the Miss USA Pageant that had occurred two days prior, that she "knew the show must be rigged." During the "Today" interview, Monnin referred to the possibility that her claims "would potentially drastically change the reputation of the Miss Universe Organization." Monnin's statements in the June 4 post, the June 5 post, and the "Today" interview all related directly to MUO and its production of the Miss USA Pageant, and were thus statements "of and concerning" MUO.

### B. Monnin's Statements are Likely to be Understood as Defamatory.

Under New York law, statements that "accuse[] the [victim] of, and impute[] to [the victim's] business, fraud, dishonesty, misconduct, and unfitness" are "defamatory per se." *Gatz v. Otis Ford, Inc.*, 262 A.D.2d 280, 281 (2d Dep't 1999); *see also Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179-80 (2d Cir. 2000). Monnin's statements directly attack the honesty and integrity of MUO's business, and are thus defamatory per se.[3] Considered in their entirety, Monnin's statements afford no non-defamatory interpretation, and require no additional analysis as to their libelous and slanderous nature. *See Celle*, 209 F.3d at 185-86, 189 (finding that the

---

[3] "The gravaman [*sic*] of an action alleging defamation is an injury to reputation." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000).

district court correctly concluded that statements made by defendants in each of two newspaper articles were defamatory per se where the statements made "attack[] [plaintiff's] trustworthiness as a businessperson" and would cause those "who read the article to question [plaintiff's] professional integrity.").

### C. Monnin's Statements are False.

"A public figure seeking recovery in a libel action . . . must establish the falsity of the defamatory statements." *Celle*, 209 F.3d at 181. All of Monnin's statements against MUO are untrue and uncorroborated. While Monnin has claimed that she "knew the show must be rigged" and that "what Miss Florida [Karina Brez] said was true," not a single other contestant, including Ms. Brez, has come forward to corroborate Monnin's assertions, and no list resembling the one Monnin described as the basis for her statements has surfaced. The actual, uncontroverted evidence will demonstrate the falsity of Monnin's claims and establish instead that the Miss USA Pageant is scored fairly by the panel of judges, that the judges' scores are the criteria for contestants' advancement through the competition, and that the scores and results are supervised and audited by Ernst & Young, a highly-reputable accounting firm. Monnin's claims are belied by the very structure of the Miss USA scoring system, and particularly by the role of Ernst & Young in auditing the results, which makes it impossible for the contest to be "rigged" or for the results to be pre-determined in any way.

### D. Monnin's Statements Were Made With Actual Malice.

In order to demonstrate "actual malice," a public figure defamation plaintiff must show that the defamatory statement was "made with knowledge that it was false or with reckless disregard of whether it was false or not." *Church of Scientology Int'l*, 238 F.3d at 174 (internal quotation omitted). Relevant factors in the "actual malice" inquiry include "(1) whether a story

10

is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.; see also Celle*, 209 F.3d at 183 ("Actual malice can be established through the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence.") (internal quotation omitted). Here, Monnin's actual malice can be inferred from the evidence that will be offered at the hearing.[4]

As the evidence will show, Monnin's claims are uncorroborated and, if not wholly fabricated, are at best based upon a named source who has by no means verified Monnin's statements. Monnin admits to never seeing any pre-determined list of pageant results herself, and claims to have relied solely on the hearsay account of another competitor as the basis for Monnin's spiteful campaign against MUO. Monnin's allegations that the pageant was "rigged" and "fraudulent" cannot be true because of the rigorous, independent, and carefully audited process governing scoring at the Miss USA Pageant. And Monnin's strong objection to MUO's decision to allow transgendered contestants, coupled with the fact that she failed to advance in

---

[4] MUO requested discovery from Monnin on September 21, 2012, and as of the date of filing of this brief, Monnin has not responded to MUO's requests in any way. The "actual malice inquir[y] typically requires discovery." *Church of Scientology Int'l*, 238 F.3d at 173. MUO asserts that Monnin's actual malice can be inferred from the available evidence, but if it is found that the available evidence is not enough to support such an assumption, MUO requests that an adverse inference be made against Monnin for her willful failure to comply with her discovery obligations in this matter, which deprived MUO of relevant evidence regarding her knowledge of the truth or falsity of her public statements. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (holding that courts may properly impose an adverse inference for failure to produce evidence where the requesting party shows "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a 'culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim. . .").

the final competition, creates obvious motivation for Monnin to fabricate or distort comments she may have heard during the competition. Monnin had strongly disagreed with MUO when it allowed transgendered persons to enter its pageants, and she was upset when she failed to advance in the competition. The night of the final competition, Monnin was reminded of the controversy and her intense moral objection when, during the Pageant's finals, Olivia Culpo (the eventual winner of the Miss USA Title) was asked an interview question about transgendered contestants and came out in support of MUO's decision.[5] This evidence is enough to establish actual malice. *See Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.").

The evidence will establish that Monnin recklessly persisted in her claims even in the face of evidence that her accusations against MUO were not true. During the "Today" interview on June 8, Ann Curry suggested to Monnin that the alleged source of Monnin's information, Karina Brez (Miss Florida USA), had stated that any comments she made to Monnin were a joke and that the eventual winner of the pageant (Olivia Culpo, Miss Rhode Island USA) was not on any list Ms. Brez saw.[6] Rather than reconsider her position, Monnin rejected the possibility that

---

[5] Notably, during the finalists' interview competition, Ms. Culpo randomly selected from the bowl of questions the one question submitted by a fan through the social networking site Twitter: "Would it be fair if a transgender woman won the Miss USA title?" Ms. Culpo appeared to embrace MUO's recent rule amendment in her response, explaining: "I do think that that would be fair, but I can understand that people would be a little apprehensive to take that road because there is a tradition of natural-born women. But today where there are so many surgeries and so many people out there who have a need to change for a happier life, I do accept that because I believe it's a free country."

[6] Regardless of what Ms. Brez may or may not actually have said, the very fact that Monnin recklessly refused to reconsider her statements and continued to slander MUO after being confronted with evidence that her statements were false establishes that Monnin was acting with

she had misinterpreted Ms. Brez's comments and continued to disparage MUO, even in the face of evidence that her statements were based on false information. By persisting in her disparaging remarks despite this evidence that those remarks were false, Monnin showed a reckless disregard for whether or not her statements were actually true, and she went on to declare to a national television audience, with actual malice, that MUO was "fraudulent" and dishonest.

### E. Monnin's Statements Were Presented as Fact.

Utterances of pure opinion are protected expression under the First Amendment; therefore, only statements asserted as fact can lead to defamation liability—in part because only statements of fact can be proven true or false. *Guerrero v. Carva*, 10 A.D.3d 105, 111 (1st Dep't 2004). A court analyzing whether a particular statement is presented as opinion or fact "should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995).

Here, Monnin's statements assailing the integrity of MUO were presented as assertions of fact. In the June 5 post, which was widely disseminated by the media, Monnin presented her account of what Ms. Brez had told her, and stated unequivocally that Monnin "knew the show must be rigged." In the "Today" interview, Monnin retold her account of her conversation with Ms. Brez during the final competition, and stated that there was "no doubt in [her] mind" that what Ms. Brez had allegedly told her was true and that there was "too, too much evidence pointing to [the Miss USA Pageant] being fraudulent." Any reasonable reader of the June 5 post, or viewer of the "Today" interview, would believe that Monnin was presenting facts about what had happened, not merely an opinion about the events that had transpired.

---

actual malice. In fact, MUO made several efforts to contact Monnin to obviate any concerns she legitimately had. Those overtures went unanswered.

To the extent that Monnin's statements contain qualifiers regarding what Monnin "believes" about the morals or integrity of MUO, her statements are still actionable, as "even in cases where a statement falls within the protective shield of expressions of opinion, such opinions will lose their protection and become actionable where the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it." *Guererro*, 10 A.D.3d at 112 (internal quotation omitted). Any "beliefs" espoused by Monnin with regard to the honesty or integrity of MUO or the Miss USA Pageant are presented as having been based upon Monnin's alleged conversation with Ms. Brez during the final competition, the facts of which are not known to any member of the audiences for Monnin's statements, and are thus, at best, the very type of actionable "mixed opinion" described by the Court in *Guererro*. *See id.*

### F. Monnin's Statements Caused Harm to MUO.

The evidence will show that MUO's chief sources of revenue include the money it receives from the network that televises the Miss USA and Miss Universe Pageants, the money it receives from the venue of the televised pageants, funds it receives from sponsors, and franchise fees paid by state pageant directors. In the short time since Monnin began her spiteful campaign, MUO has suffered financial injury related to each of these sources, in addition to the significant reputational harm inflicted upon MUO by Monnin's baseless and malicious statements.

Monnin's statements that MUO's Pageant is "fraudulent" and "dishonest" directly assail MUO's business integrity, and are thus "defamatory per se." Injury to MUO is therefore presumed under the law. *Yesner v. Spinner*, 765 F. Supp. 48, 52 (E.D.N.Y. 1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se', and therefore actionable

without any proof of special damages . . . Damage to the reputation of the person defamed under such circumstances is presumed, and the plaintiff need not plead or establish them as an element of his libel cause of action."); *see also Celle*, 209 F.3d at 180 ("A related rule is that where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed.") (internal quotation omitted). Even where a plaintiff who establishes defamation per se cannot demonstrate any damages whatsoever, that plaintiff is still entitled to judgment in its favor and an award of nominal damages. *Celle*, 209 F.3d at 179. Here, although Monnin's statements are defamatory per se, MUO has suffered demonstrable financial injury as a result of her defamation. In fact, MUO's entire existence depends upon it ensuring a fair competition in which a legitimate winner is crowned.

As will be demonstrated by the evidence, the Miss USA and Miss Universe Pageants are televised events that attract intense media attention. MUO holds these events once each year at a major venue (the "host site"), in various locations around the world. The host site traditionally pays a "site fee" to MUO in return for the exposure and business that it receives from the event. At the time the Miss USA 2012 Pageant was held, MUO was in the process of negotiating a $5,000,000 site deal with corporate sponsors in the Gulf Coast region affected by the oil spill that would have resulted in the Miss Universe Pageant being held in Biloxi, Mississippi in December 2012. Shortly after Monnin made her accusations against MUO, the Biloxi site deal fell apart. MUO was forced to scramble to find a suitable alternate location for the quickly-approaching event. The Planet Hollywood Hotel and Casino in Las Vegas, Nevada became the site of the Miss Universe 2012 Pageant, but MUO is not receiving a site fee for this Pageant.

Contestants who enter MUO-sanctioned pageants are required to submit an entry fee along with their application. Each applicant accounts for several thousand dollars in revenue for

MUO-sanctioned state-level pageant organizations. Those organizations pay franchise fees to MUO. Since Monnin made her statements impugning the integrity of MUO, the number of entry applications for MUO-sanctioned pageants has fallen. Moreover, state organizations have been forced to spend more money on marketing to offset the reputational injury caused by Monnin's defamatory statements.

Additionally, evidence will show that Monnin's malicious campaign has caused significant harm to MUO's brand and public image. MUO faces great difficulty in repairing this reputational injury. The evidence will show that all of this economic harm sustained by MUO is attributable to Monnin's comments.

## II.   MONNIN'S ACTIONS TORTIOUSLY INTERFERED WITH MUO'S PROSPECTIVE ECONOMIC ADVANTAGE.

"In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994). Monnin interfered with MUO's prospective economic advantage when she made defamatory statements in the June 4 and June 5 posts and during the "Today" interview.

As discussed in Section I.F., during June 2012 MUO enjoyed established or likely business relationships with third parties, including Gulf Coast region corporate sponsors. Monnin interfered with these business relationships by publicly (and falsely) calling into question MUO's integrity and accusing MUO of fraudulent and dishonest conduct. Monnin made these statements in an effort to harm MUO, because Monnin was upset that she had failed to advance in the Miss USA Pageant and she maintained a strong personal objection to MUO's

decision to allow transgendered contestants in its pageants. Monnin also used unfair and improper means to harm MUO when she made untrue and malicious statements defaming MUO. Relationships between MUO and some of its longest-standing and largest sponsors have become strained, and MUO has been forced to expend significant time and resources in an effort to "set the record straight" with sponsors who have concerns regarding a continued association with MUO. Monnin's statements have also interfered with MUO's business relationship with potential pageant applicants, as a drop in applications since Monnin made her statements demonstrates that many likely entrants chose not to enter into a business relationship with MUO or its sanctioned state-level organizations. A large number of MUO's business relationships have thus been injured or prevented altogether by Monnin's defamatory statements.

### III.   MONNIN'S ACTIONS CONSTITUTE BREACH OF CONTRACT.

Upon entering both the Miss Pennsylvania USA Pageant and the Miss USA Pageant, Monnin executed and submitted entry forms and agreed to abide by the obligations contained therein. MUO has performed all of its obligations under these agreements with regard to Monnin. The defamatory statements made by Monnin in June 2012 breached several provisions of these entry form agreements.

Paragraph 5(l) of the Miss USA Pageant Entry Form prohibits the contestant from disparaging MUO or involving MUO in scandal; Monnin agreed by submitting the Entry Form that she "will not engage in any activity that might bring myself, [MUO], the Miss USA Pageant, my State Pageant, the Miss USA Pageant system, [Donald] Trump, NBC, or any of their respective subsidiaries . . . into public disrepute, ridicule, contempt or scandal or might otherwise reflect unfavorably upon any of the foregoing individuals or entities or might shock, insult or offend the community or any class or group thereof." Monnin further agreed in Paragraph 5(f)

of the Miss USA Entry Form that she would not "violate the rights of any other person or entity" or "cause harm to any person . . . in connection with [her] participation in the Miss USA Pageant." Monnin had earlier covenanted "not to engage in any conduct, acts or omissions that may be detrimental to [the] Miss USA Pageant" when she agreed to Paragraph 5(a)(4) of the Entry Form for the Miss Pennsylvania USA Pageant. Beginning with her texts claiming that the pageant was "f'ing rigged" while the final telecast was still airing, Monnin violated these agreements through her public and defamatory statements against MUO and the integrity of the Miss USA Pageant, thereby placing MUO in the center of a public scandal, bringing MUO's integrity into public disrepute, and causing direct harm to MUO in connection with Monnin's participation in the Miss USA Pageant.

As discussed in Section I.F., MUO has suffered direct economic harm as a result of Monnin's willful breach of these agreements.

## CONCLUSION

For the foregoing reasons, Claimant's request for relief should be granted in full.

Dated: October 26, 2012
New York, New York

Respectfully submitted,

COOLEY LLP

By: _____
Scott S. Balber
Timothy L. Foster

1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 479-6000
sbalber@cooley.com
*Attorneys for Miss Universe L.P., LLLP*