UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
MISS UNIVERSE L.P., LLLP.,                              :
                                  Petitioner,  :
                                                        :          12 Civ. 9174 (JPO)
                       -v-                              :
                                                        :          OPINION AND ORDER
SHEENA MONNIN,                                          :
                                  Respondent.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Respondent Sheena Monnin ("Monnin") is the former Miss Pennsylvania USA, and this

matter relates to a dispute between Monnin and the Miss Universe L.P., LLLP ("MUO"), which

organizes and runs the Miss USA Pageant together with one of its equity owners, Donald Trump.

Before the Court are Petitioner MUO's petition to confirm the Arbitration Award entered in its

favor, pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, and Respondent Monnin's cross-

petition to vacate that award.  For the reasons that follow, MUO's petition is granted, Monnin's

cross-petition is denied, and the Arbitration Award is confirmed.

## I.      Background

### A.      Factual Background

#### 1.      The Pageants

      On December 4, 2012, Monnin was crowned Miss Pennsylvania USA 2012.

(Memorandum of Law in Opposition, Dkt. No. 17 ("Monnin Opp."), at 4.)  In the wake of her

victory, Monnin met with Randy Sanders ("Sanders"), the owner of Sanders & Associates, Inc.,

which owns the franchise for the Miss Pennsylvania USA Pageant.  Sanders provided Monnin

with three contracts, including one between Monnin and MUO.  (*Id.*)  According to Monnin, the

documents were "long, single spaced, extremely dense, and full of legal terms that [Monnin] did not understand." (*Id.*)  Although Monnin asserts that she "barely [had] read through the first few pages (which did not contain an arbitration clause)," when Sanders returned and asked her if she had questions (*id.* at 4-5), a copy of the relevant contract reveals that Monnin initialed every page, and signed the final one. (Declaration of Scott S. Balber, Dkt. No. 23 ("Balber Decl."), Ex. A.) Sanders later provided Monnin with a signed copy of the two contracts with Sanders & Associates, as well as with an unsigned copy of the agreement with MUO. With respect to this latter document, Monnin contends that "[h]aving only read the first few pages, [she] could not confirm that the third document was an actual copy of the Miss USA agreement that she had signed." (Monnin Opp. at 5.)

Monnin, as Miss Pennsylvania USA, went on to compete in the Miss USA Pageant in Las Vegas, Nevada. The telecast for the Miss USA Pageant began on June 3, 2012, with fifty-one contestants onstage. The field, however, was quickly limited to the top 16 contestants, based upon scoring from a prior, preliminary round. During a commercial break, the women who did not advance, Monnin among them, were dismissed from the stage. (*Id.* at 5-6.) While waiting in the wings before returning to the dressing rooms, Monnin claims that Miss Florida USA, Karina Brez ("Brez"), intimated that the results of the contest were predetermined, stating: "I know who is going to be in the top 5." (*Id.* at 6.) After inquiring further, Monnin contends that Brez explained that she had seen a "paper in a notebook in the back of the stage entitled 'final show telecast' earlier in that day," in which the top 5 contestants were already listed, despite the fact that the competition had not yet proceeded to the finals. (*Id.*) Immediately, Monnin texted Sanders, stating "this is f-ing rigged Randy," adding various other statements such as "I'm done. This is ridiculous" and "It's obviously rigged so the girl they want can shine; they kept several

2

beautiful girls out for that reason." (Declaration of Richard F. Klineburger, III, Dkt. No. 18

("Klineburger Decl."), Ex. P ("Final Award"), at 4; Declaration of Respondent Sheena Monnin,

("Monnin Decl."), Ex. A.)[1]  Monnin asserts that she remained silent for the remainder of the

competition, "hoping that Brez would turn out to be wrong." (Monnin Opp. at 6.)  The final 5

women, however, matched those on the putative list, and the overall "winner was Miss Rhode

Island USA, Olivia Culpo, just as Brez stated." (*Id.*)

    The morning after the pageant, on June 4, 2012, Monnin emailed Sanders her resignation;

she also sent Sanders a text message which stated as follows: "Please check your email.  I have

sent you my final and unchangeable thoughts and decision.  I will not change my mind or be

talked out of this decision.  Time will not change my decision.  I consider my choice to be

effective immediately." (Monnin Decl., Ex. A.)  She also added: "I will not keep quiet on this.

This was not fair play." (*Id.*)  Monnin's resignation email to Sanders cited her disagreement with

the MUO decision to permit transgendered contestants to compete in the Pageant, stating: "I

refuse to be part of a pageant system that has so far and so completely removed itself from its

foundational principles as to allow and support natural born males to compete in it.  This goes

against every moral fiber of my being." (Final Award, at 5.)

### 2.    The Relevant Statements

    That same day, Monnin posted on her Facebook page, informing her fans of her

resignation.  She wrote the following:

---

[1] This text message exchange also included a barrage from Monnin stating, in rapid succession:
"Seriously?" "Colorado?"; "South Carolina?"; "Florida saw the list of Top 5 this morning"; "It
 was on a script for the show tonight"; "I'm fine. But I thought his was an honest system"; "I
truly hope it is."  Sanders expressed his belief that the system was well-regulated and honest, and
implored Monnin to "Be strong!" and not to "let this change who you are!"

> I have decided to resign my position as Miss Pennsylvania USA 2012. Effective immediately I have voluntarily, completely and utterly removed myself from the Miss Universe Organization. In good conscience I can no longer be affiliated in any way with an organization I consider to be fraudulent, lacking in morals, inconsistent, and in many ways trashy. I do not support this system in any way. In my heart I believe in honesty, fair play, a fair opportunity, and high moral integrity, none of which in my opinion are part of this pageant system any longer.

(*Id.* at ¶ 47.) Monnin received some initial support from fellow Pageant contestants, with one sending her a Facebook message stating: "I'm so proud of you. I was there with you backstage when it all went down. Didn't Kelly O[2] also confirm the script? So crazy. Love u sista. Flo-Reeeeda!" Monnin responded, thanking the unnamed contestant for her support, to which the woman replied: "This is kind of cool. You started a big buzz and the blogs actually agree with you. Go girl!" (Monnin Decl., Ex. B.) Monnin also received a text message from another Pageant participant, who applauded Monnin for speaking out and added, "hopefully this brings more awareness to how shady this particular competition really was." (*Id.*, Ex. C.) Bolstered by this support, Monnin wrote another Facebook post on June 5, 2012:

> I agree that it is my moral obligation to state what I witnessed and what I know to be true. I will relay to you the reasoning behind my resignation. I witnessed another contestant who said she saw the Top 5 BEFORE THE SHOW EVER STARTED proceed to call out in order who the Top 5 were before they were announced on stage. Apparently the morning on June 3rd she saw a folder lying open to a page that said 'FINAL SHOW telecast, June 3, 2012'. After the Top 16 were called and we were standing backstage she hesitantly said to me and another contestant that she knew who the Top 5 were. I said 'who do you think they will be? She said that she didn't 'think' she 'knew' because she saw the list that morning. She relayed whose names were on the list. Then we agreed to wait and see if that was indeed the Top 5 called that night. After it was indeed the Top 5 I knew the show must be rigged; I decided at that moment to distance myself from an

---

[2] Referring to celebrity Kelly Osborne.

> organization who did not allow fair play and whose morals did not match my own.  That is all I know about this.  If this contestant would like to step forward as an eye witness and as being the one who saw the sheet with the Top 5 already selected before the judges ever saw the Top 16, then perhaps action can be taken.  As for me, I believe her words and I will not encourage anyone to compete in a system that in my opinion and from what I witnessed was dishonest.

(*Id.* at ¶ 51.)  In the aftermath of these two Facebook posts, Monnin claims that MUO "went on a veritable media frenzy," with Trump stating on Good Morning America that Monnin suffered "loser's remorse," and MUO's counsel threatening legal action.  (Monnin Opp. at 8.)  Trump also appeared on the Today Show, where he called Monnin's allegations "disgraceful," and noted that Brez denied that she had seriously contended the show was "fixed" or predetermined.  Later, Brez appeared on E! and confirmed Trump's account, explaining that she was only joking when she spoke about the rehearsal list and adding that the eventual winner, Olivia Culpo, was not on that list, and as such, the Pageant could not have been rigged.  (*Id.* at 8-9.)

Monnin claims that, "overwhelmed" with the attacks against her, and supported by some of her fellow contestants,[3] she "felt compelled to publically respond."  (*Id.* at 9.)  It is this compulsion which gave rise to an appearance by Monnin on the Today Show, and eventually,

---

[3] One contestant texted Monnin in the wake of MUO's and Trump's media statements: "I'm proud of you for standing up for what you believe in.  Your are [sic] a strong, beautiful, and intelligent woman, don't let Trump make feel [sic] like anything less!  I sincerely hope that the truth will come out and it will because of your courage to speak up."  (Monnin Decl., Ex. D.)  Another sent her a similarly encouraging Facebook message:

> I've been talking with the other girls and we're all disgusted with how they are trying to turn things against you in the media.  We know you didn't make this up out of no where [sic] – a lot of girls know about that list backstage and are outraged.  I personally heard about it straight from the girl who saw the list.  I want to thank you for not just sticking up for yourself and your beliefs, but all of us.  We want to get behind you on this if we can, if there's anything we can do let us know!

(*Id.*, Ex. E.)

resulted in the Arbitration Award against her.   During Monnin's discussion with Ann Curry,

airing on June 8, 2012, Monnin repeated the substance of her Facebook posts and beliefs on

national television, explaining in detail her conversation with Miss Florida USA.  (Final Award,

at 6.)  In response to Curry's statement that Brez, Miss Florida, had since clarified her

statements, Monnin explained that "many years of psychological training" had enabled her to

discern when an individual was being truthful.  (*Id.* at 7.)  Accordingly, Monnin reiterated that

she was sure, without a doubt, that Miss Florida had been honest when she had stated that the

results of the contest were predetermined.  (*Id.*)  Monnin also added that she had no intention of

utilizing the Today Show interview in order to "destroy" or "bad talk" anybody, but rather,

simply wanted to provide her version of events.  (*Id.* at 9.)  The day following the interview,

Monnin received another text of support from a fellow contestant, who wrote, *inter alia*: "Wow I

can't believe FL is denying what she said now."  (Monnin Decl., Ex. E.)

### 3.     The Arbitration

Monnin's contract with MUO, titled "Official Entry Form/Contract 2012 Miss USA

Pageant," provided that in the event that "any controversy or claim arising out of or relating to

this Agreement, the breach of any term hereof, or [] participation in or in connection with the

Pageant" could not "be settled through direct discussions," the parties agreed to "endeavor first

to settle the controversy or claim by mediation . . . administered by JAMS," and if unable to

resolve the issues, agreed to submit to "binding arbitration . . . administered by JAMS."  (Final

Award, Ex. B, ¶ 22.)  Accordingly, on June 25, 2012, after Monnin failed to participate in

mediation, MUO filed its Demand for Arbitration and Statement of Claim with JAMS, serving it

on Monnin.  (Monnin Opp. at 10.)  MUO's Statement of Claim sought compensatory damages of

$10 million, for alleged defamation, tortious interference with prospective economic advantage,

and breach of contract.  (*See* Balber Decl., Ex. D.)  Over the course of the next several months, JAMS and MUO's counsel engaged in significant correspondence with both Monnin and her attorney Richard Klineburger, III.  (*See* Reply Memorandum of Law in Further Support, Dkt. No. 22 ("MUO Rep."), at 3-5.)  However, neither Monnin nor Klineburger participated in the arbitration process, and they both failed to appear at the Arbitration Hearing, which took place on November 5, 2012.[4]  It appears that Monnin was unaware that the Arbitration Hearing was going forward, as her attorney had not told her as much.  (*See* Monnin Opp. at 13 ("[T]otally unbeknownst to Sheena, on November 5, 2012, an arbitration hearing had proceeded before Arbitrator Katz.").)  In addition to engaging in pre-hearing briefing, at the day-long Hearing, MUO provided various exhibits, including a videotape of Monnin's Today Show interview, and live testimony from four witnesses: (1) Paula Shugart, MUO's President; (2) Tal Goldhammer, an Ernst and Young partner responsible for monitoring the Pageant's judging process; (3) Craig Heitkamp, a state director and franchisee of MUO; and (4) Jonathan Low, an expert witness who testified regarding damages.  (*See* MUO Rep. at 6-7.)

On December 10, 2012, Arbitrator Theodore H. Katz issued his Arbitration Award.  (*See generally* Final Award.)  In his Award, Arbitrator Katz meticulously reviewed the background circumstances of the dispute between Monnin and MUO, describing the various statements made by Monnin—via text message; on Facebook; and finally, during her television interview on the Today Show.  (*Id.* at 4-6.)  The Award noted that "when questioned by MUO officials, Miss Florida expressed shock that Monnin was claiming that she had identified the five finalists before they were announced."  (*Id.* at 7.)  Arbitrator Katz wrote that despite the fact that Miss Florida

---

[4] The various exchanges among JAMS, MUO, Monnin, Klineburger, and MUO's counsel are documented and discussed in further detail below in section III.B.

had clarified her statements, Monnin nonetheless repeated her allegations concerning the Pageant during her Today Show interview. (*Id.*) Additionally, the Award detailed the "many comments and questions" MUO received from "the press, the general public, as well as franchisees and other business-related entities" in the wake of Monnin's public comments. (*Id.*)

Arbitrator Katz also discussed how, "[i]n the months preceding the 2012 Miss USA Pageant, MUO had been planning to stage its 2013 Pageant on the Gulf Coast." (*Id.*) In an effort to do so, MUO met with "members of the local Congressional delegation and other local politicians, who endorsed the locale of the Pageant and viewed it as a means of increasing tourism on the storm-ravaged Gulf Coast." (*Id.*) In keeping with this theme, MUO engaged in significant discussions with BP as a potential corporate sponsor, "who was prepared to pay a $5 million site fee to MUO, as a means of burnishing its corporate image." (*Id.*) However, Arbitrator Katz cited testimony showing that, in the wake of Monnin's comments, when "MUO resumed discussions with [BP]," the sponsor inquired as to "the allegations of 'rigging', [and] expressed concern about the effect on its image," eventually choosing to "abandon[] the proposed sponsorship." Furthermore, the Award explained that, as a result of this sponsorship loss, MUO was forced to "hastily" make "arrangements to stage the Pageant in Las Vegas, where it did not receive a site fee." (*Id.*)

In analyzing liability, Arbitrator Katz found that Monnin published defamatory statements about MUO on Facebook and on the Today show, and furthermore, that the statements were factual, capable of proof, false, and "obviously harmful to MUO's business reputation." (*Id.*) Moreover, he concluded that Monnin made the statements with "actual malice." (*Id.* at 9-10.) However, Arbitrator Katz found no breach of contract, as Monnin had already resigned by the time she published the June 5 Facebook statement and engaged in the

8

Ann Curry interview.  Regarding damages, Arbitrator Katz found that MUO had proved that it lost $5 million in the form of the BP site fee, as the sponsorship failed to go forward due to the "rigging allegations." (*Id.* at 12-13.)  He denied MUO's claims for additional damages, citing a lack of "sound basis to fix a reasoned and reasonably precise amount of loss of [market] value," and also declined to award MUO injunctive relief. (*Id.* at 14.)  To summarize, Arbitrator Katz awarded $5 million in monetary damages to MUO, finding that Monnin had defamed the organization with her public statements. (*Id.* at 16.)

### B.      Procedural Background

MUO filed its Petition to Confirm the Arbitration Award with this Court on December 17, 2012.  (Dkt. No. 1.)  MUO next requested that the Court enter a default judgment against Monnin, who had been served with the Petition on December 20, 2012.  (Dkt. Nos. 4, 5.)  In early January, Monnin, who at the time was *pro se*, requested a four-week extension to respond to the Petition.  (Dkt. No. 11.)  This Court granted Monnin's request and set a briefing schedule in its Order of January 11, 2013.  (Dkt. No. 9.)  Monnin, who by this time had secured counsel, filed her Cross-Motion to Vacate the Arbitration Award on February 5, 2013.  (Dkt. No. 16.)  MUO submitted its Reply Memorandum of Law on February 20, 2013.  (Dkt. No. 22.)

## II.     Legal Standard

"It is well-settled that judicial review of an arbitration award is narrowly limited," *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 120 (2d Cir. 1991), and the reviewing court "must grant" the petition to confirm an award "unless the award is vacated, modified, or corrected," 9 U.S.C. § 9; *accord D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).  Moreover, a reviewing court may vacate an Arbitration Award only in certain, specific

circumstances.  *Id.*  The Federal Arbitration Act ("the FAA") limits grounds for vacatur to the

following four circumstances:

> (1) where the award was procured by corruption, fraud, or undue
> means;
> (2) where there was evident partiality or corruption in the
> arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to
> postpone the hearing, upon sufficient cause shown, or in refusing
> to hear evidence pertinent and material to the controversy; or of
> any other misbehavior by which the rights of any party have been
> prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly
> executed them that a mutual, final, and definite award upon the
> subject matter submitted was not made.

9 U.S.C. § 10(a); *accord Rich v. Spartis*, 516 F.3d 75, 81-82 (2d Cir. 2008).  In addition to the

grounds for vacatur specified in § 10(a), there is a fifth, "judicially-created ground, namely that

'an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of

law.'"  *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121-22 (2d Cir. 2011) (quoting *Westerbeke*

*Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002) (footnote omitted)).

     "A party moving to vacate an arbitration award has the burden of proof, and the showing

required to avoid confirmation is very high."  *Gottdiener*, 462 F.3d at 110.  This limited review

is designed to preserve the "twin goals" of arbitration: "settling disputes efficiently and avoiding

long and expensive litigation."  *Willemijn Houdstermaatschappij, BV v. Standard Microsystems*

*Corp.*, 103 F.3d 9, 12 (2d Cir. 1997).  The Second Circuit has consistently emphasized the

"extremely limited" role of courts in reviewing arbitration awards, *Wall Street Assoc., L.P. v.*

*Becker Paribas, Inc.*, 27 F.3d 845, 849 (2d Cir. 1994) (citations omitted), and accordingly,

"[o]nly 'a barely colorable justification for the outcome reached' by the arbitrators is necessary

to confirm the award," *Gottdiener*, 462 F.3d at 110 (quoting *Landy Michaels Realty Corp. v.*

*Local 32B-32J, Service Employees Int'l Union*, 954 F.2d 794, 797 (2d Cir. 1992)).  Therefore, even when a reviewing court disagrees with the merits of an arbitrator's decision, so long as "'a ground for the arbitrator's decision can be inferred from the facts of the case,'" the award will be confirmed. *Barbier*, 948 F.2d at 121 (quoting *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1216 (2d Cir. 1972)).

## III.   Discussion

Monnin moves to vacate the Arbitrator's award on three alternative grounds: (1) that Arbitrator Katz exceeded the scope of his powers, as proscribed by 9 U.S.C. § 10(a)(4); (2) that Monnin lacked both actual and constructive notice of the Arbitration Hearing and the claims it was to resolve, making the process fundamentally unfair, as contemplated in 9 U.S.C. § 10(a)(3); and (3) that Arbitrator Katz's decision was based upon a manifest disregard for the law.  The Court addresses each argument in turn.

### A.      Scope of Arbitrator's Powers

Monnin first contends that Arbitrator Katz exceeded his powers in awarding $5 million in damages for defamation, asserting that the television interview upon which Arbitrator Katz based his findings was not raised in MUO's statement of claim, and thus, was not properly submitted to arbitration. *See, e.g.*, 9 U.S.C. § 10(a)(4) ("where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award *upon the subject matter submitted* was not made" (emphasis added)).

The Second Circuit has "'consistently accorded the narrowest of readings' to section 10(a)(4) permitting vacatur where the arbitrator has exceeded her powers." *Jock*, 646 F.3d at 122 (internal quotations omitted) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)).  The central inquiry when examining vacatur under § 10(a)(4) is

"whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Westerbeke Corp. v. Daihatsu Motor Corp.*, 304 F.3d 200, 220 (2d Cir. 2002) (quoting *DiRussa v. Dean Witter Reynolds Inc.*, 212 F.3d 818, 824 (2d Cir. 1997)) (quotations omitted).  Thus, alleged legal errors, even those of a serious nature, will not give rise to the circumstances contemplated by § 10(a)(4).  "Accordingly, an arbitrator may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement."  *Jock*, 646 F.3d at 122.  Neither circumstance is present here.

Courts especially emphasize the narrowness of § 10(a)(4) "when [it] is invoked to challenge an award deciding 'a question which all concede to have been properly submitted in the first instance.'"  *Id.* (quoting *DiRussa*, 121 F.3d at 824).  Likewise here, all parties concede that MUO's defamation claim was properly submitted to arbitration; however, Monnin seeks vacatur on the ground that Arbitrator Katz exceeded his powers in determining that Monnin defamed MUO during her television interview, contending that the statements Monnin made on the Today Show were outside the scope of the issues submitted for arbitration.  In response, MUO asserts that Monnin's Today Statements were thrice submitted to Arbitrator Katz: (1) in the Statement of Claim; (2) in MUO's pre-hearing briefing; and (3) at the Arbitration Hearing itself.

With respect to the Statement of Claim, Monnin substantially relies on the Fifth Circuit case *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649 (5th Cir. 1979), claiming that the case's reasoning applies with full force here.  (*See* Monnin Opp. at 18-20.)  *Totem*, however, as emphasized by its progeny, is inopposite here.  "In *Totem*, the parties,

Totem and North American, entered into a charter agreement for a vessel owned by Totem, which Totem terminated before the agreement expired." *Capgemini U.S. LLC v. Sorensen*, No. 04 Civ. 7584 (JGK), 2005 WL 1560482, at *8 (S.D.N.Y. July 1, 2005).  The *Totem* court held that "[t]he arbitration panel exceeded its powers by awarding damages for charter hire to North American," when North American had "fail[ed] to list charter hire in its itemized statement of damages submitted to Totem," and had "conceded" in its brief "that charter hire was not an issue in the arbitration." *Totem*, 607 F.2d at 651.  Moreover, in an itemization of its damages, North American notably failed to include any damages associated with charter hire. *Id.* at 651-52. Accordingly, when the arbitrators nevertheless awarded damages for charter hire, they had "ignored the arbitral dispute submitted by the parties and dispensed their 'own brand of industrial justice.'" *Id.* at 652 (quoting *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (1960)).  Here, however, the circumstances are markedly different.

First, Monnin's Today Show statements were within the scope of the original Statement of Claim.  The first allegation in the Statement of Claim is that of defamation.  (*See* Klineburger Decl., Ex. B, at ¶¶ 32-37.)  As is common practice, the defamation claim incorporates the factual allegations of the entire Statement—factual allegations that include the assertion that "[t]he libelous [Facebook] post concerning MUO has been republished and widely disseminated by the media in print, radio, *television* and via the internet."  (*Id.* at ¶17 (emphasis added).) Accordingly, the Today Show statements can reasonably be considered as within the scope of the Statement of Claim.  Moreover, the courts, in more recent years, have readily distinguished *Totem*, noting that "federal law does not impose any requirements as to how specific a notice of arbitration must be," *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1322 (5th Cir. 1994), meaning that even where a specific claim is not asserted in extreme detail in the original

Statement of Claim, it remains within the arbitration's scope, so long as the issue is generally submitted to arbitration, *see Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Int'l, Ltd.*, 683 F. Supp. 945, 957-58 (S.D.N.Y. 1988), *aff'd*, 888 F.2d 260 (2d Cir. 1989) (holding that an award of $5.1 million in consequential damages did not exceed arbitrators' power, even though "the original pleading in the case sought total damages of approximately $6.7 million, and [] the original pleading was not amended to allow so large a claim for consequential damages"); *see also Harper Ins. Ltd. v. Century Indem. Co.*, 819 F. Supp. 2d 270, 277 (S.D.N.Y. 2011) ("It is indisputable that arbitrators have no authority to rule on an issue not submitted to them. However, there is no parallel *per se* rule that it is beyond the authority of the arbitrators to issue a remedy directed to an issue squarely before them unless it was requested by one of the parties. The case law presented by petitioners only supports the former, uncontested, rule of law."); *Capgemini*, 2005 WL 1560482, at *8 ("Here, unlike in *Totem*, the Panel did not decide a separate theory of liability that was not at issue in the arbitration.  Although Capgemini disputes the form that the damages for the 10,201 shares took, it does not dispute that liability for the shares was a central issue in the arbitration and was fully litigated.  Therefore, *Totem* does not provide support for the argument that the Court should for vacate the Award based pursuant to § 10(a)(4).").

Second, even if the Statement of Claim were to be considered too vague to reasonably include the Today Show statements, these comments were directly submitted to Arbitrator Katz as aspects of the defamation claim at two other "critical junctures" of the arbitration process: namely, (1) in MUO's pre-hearing brief; and (2) at the Arbitration Hearing itself.  (*See* MUO Rep. at 12.)  MUO submitted its pre-hearing brief to Arbitrator Katz on October 26, 2012, in which MUO dedicated substantial attention to the statements made by Monnin on the Today Show.  (*See generally* Balber Decl., Ex. M.)  For example, in the brief's preliminary statement,

14

MUO noted that mere days after the two defamatory Facebook posts, "Monnin repeated her unfounded accusations on national television, even in the face of evidence that her statements could not possibly be true."  (*Id.* at 1; *see id.* at 6 ("On June 8, 2012, Monnin appeared on the popular NBC morning show 'Today.'  In an interview conducted by 'Today' co-host Ann Curry . . . , Monnin disparaged the integrity of MUO before a national television audience."); *id.* at 8 ("During the 'Today' interview, Monnin referred to the possibility that her claims 'would potentially drastically change the reputation of the Miss Universe Organization.'").)  Accordingly, Monnin's statements during the Today Show were highlighted in the pre-hearing brief as a basis for defamation liability, and it could thus have come as no surprise that the statements were later considered by Arbitrator Katz in making his eventual determination.

The centrality of the Today Show statements throughout MUO's brief is sharply contrasted with the situation in *Totem*, where the party seeking damages not only "fail[ed] to list charter hire in its itemized statement of damages submitted to Totem," but also "conceded" in its brief that "charter hire was not an issue in the arbitration."  *Totem*, 607 F.2d at 651.  Thus, when *Totem* arbitrators awarded damages associated with charter hire, it clearly reflected a use of power outside the scope of the issues submitted to arbitration, whereas here, MUO's briefing underscored the Today Show statements as bases for defamation liability.  Similarly, evidence presented at the Arbitration Hearing itself highlighted the importance of the Today Show statements within MUO's narrative.  (*See* MUO Rep. at 13 (noting that MUO President Shugart referred to the Today Show statements nearly 20 times during the course of her testimony before Arbitrator Katz and adding that the Today Show interview was screened during the Arbitration Hearing, and both the DVD and the transcript were accepted as exhibits to the Arbitration).)

15

Thus, in light of the narrowness of the § 10(a)(4) exception, together with the marked presence of the Today Show statements throughout the Arbitration process, Arbitrator Katz cannot be said to have exceeded his powers in issuing the $5 million award for defamation.

### B.    Notice

Monnin also alleges that she never received due notice of the Arbitration Hearing, and therefore that the process lacked the requisite fundamental fairness.  (*See* Monnin Opp. at 20-23.) In response, MUO contends that Monnin and her attorney refused to participate in the Arbitration process, despite repeated and adequate attempts to keep them apprised of the proceedings.

Upon her receipt of the Miss Pennsylvania USA title, Monnin undisputedly signed a contract that provided for mediation and binding arbitration in the event of "any controversy or claim arising out of or relating to [the] Agreement, the breach of any term hereof, or [Monnin's] participation in or connection with the Pageant [that could not] be settled through direct discussions."  (Balber Decl., Ex. A, at ¶ 22.)  While Monnin raises various claims about the circumstances under which she signed this contract (*see* Monnin Opp. at 4-5), she undisputedly initialed each page, including the page containing the arbitration clause, and signed the agreement, certifying that she had read it.  (Balber Decl., Ex. A, at 18.)  Accordingly, Monnin does not seriously contend that she was not bound by the contract's terms requiring that disputes be submitted to arbitration—though she does assert her attorney told her that she was not so bound—but rather, focuses more significantly on the purported lack of notice of the Arbitration process and Hearing.

It is axiomatic that while arbitration "is much less formal than a trial in court," all parties to such a proceeding are nevertheless "entitled to notice and an opportunity to be heard."  *Totem*,

16

607 F.2d at 651.  Accordingly, in examining alleged misconduct by an arbitrator, as

contemplated in § 10(a)(3), "[t]he relevant inquiry under both the federal and New York

arbitration statutes is whether misconduct by the Arbitrator resulted in a denial of 'fundamental

fairness.'"  *Euromarket Designs, Inc. v. McGovern & Co., LLC*, No. 08 Civ. 7908 (LTS)(DCF),

2009 WL 2868725, at *4 (S.D.N.Y. Sept. 3, 2009) (citations omitted).  Here, Monnin construes

her purported lack of notice as misconduct on the part of Arbitrator Katz, which in turn denied

her a fundamentally fair hearing, compelling vacatur.  Monnin's assertions, however, are belied

by the record.

### 1.        Extent of Notice to Monnin

Despite Monnin's characterization of events, it appears that both Monnin and her counsel

"received routine, consistent communications about the Arbitration from both the MUO and

JAMS and were fully aware of each stage of the proceedings."  (MUO Rep. at 4.)  First, on June

6, 2012, in the wake of Monnin's Facebook posts, MUO notified Monnin by hand delivered

letter and email that it "intend[ed] to assert" claims "arising out of false and defamatory

statements [Monnin had] made concerning the 2012 Miss USA Pageant."  (Balber Decl., Ex. C.)

In that letter, MUO directed Monnin to "retain any and all documents and electronic information

in any form . . . , relating in any way to the MUO or the Miss USA Pageant."  (*Id.*)  The next

day, on June 7, 2012, MUO began mediation proceedings, through JAMS, in accordance with

Monnin's contract with MUO.  Monnin was also sent a copy of that commencement letter—via

both email and federal express.  (*Id.*, Ex. D.)  On June 12, 2012, MUO—through counsel—

emailed Monnin in an attempt to schedule a mediation session for June 20, 2012, detailing the

foregoing attempts to contact Monnin and stating "I am trying to connect with you so that we can

move forward with the mediation which we hope will resolve the dispute between you and the

17

MUO."  (*Id.* at E.)  Monnin did not participate in the mediation, and accordingly, on June 25, 2012, MUO commenced a JAMS arbitration against Monnin.  The following day, Monnin was served with copies of the Demand, Statement of Claim, and Official Entry Form and Contract for the 2012 Miss USA Pageant.  (*See* Balber Decl., Ex. B.)

According to Monnin, she immediately turned these documents over to Klineburger, her attorney, who, in turn, told Monnin that "she was not bound by any agreement to arbitrate and that Sheena need not respond to any communications from JAMS."  (Monnin Opp. at 10.)  On June 28, 2012, Klineburger corresponded with MUO, writing that he had been retained to represent Sheena Monnin "with regard to the [JAMS Mediation] along with a ancillary [sic] claim against [MUO] and/or relevant third parties."  (Balber Decl., Ex. G.)  Klineburger not only copied Monnin on the letter, he also stated that he would "reach out to your [sic] early next week to discuss this matter further."  (*Id.*)  JAMS officially commenced the Arbitration on July 2, 2012, sending notice to both MUO's attorneys and Monnin.  (*Id.* at Ex. G.)  In the Official Commencement, JAMS enclosed a list of available arbitrators, and gave the parties instructions on the baseline procedure going forward.  (*Id.*)  The following day, on July 3, 2012, Klineburger wrote to MUO, explaining that Monnin was "not subject to the terms of the 'Official Entry Form/Contract' for the 2012 Miss USA Pageant," and as such would "not be participating in any JAMS arbitration."  (Klineburger Decl., Ex. C.)  Without discussing the reasoning behind this conclusion in detail, Klineburger stated that "as of June 4, 2012," the date of Monnin's resignation, she "had no duty to [MUO]."  (*Id.*)   Monnin was copied on this letter, as was the JAMS Resolution Center.  (*Id.*)

Ten days later, on July 13, 2013, JAMS appointed retired Magistrate Judge Theodore H. Katz as the arbitrator for the case, sending notice of that appointment to MUO's counsel and

Monnin.  (Balber Decl., Ex. H.)  Klineburger next wrote to JAMS on July 18, 2012, confirming

that he represented Monnin in the JAMS Arbitration, copying Monnin and MUO on the

correspondence.  (Klineburger Decl., Ex. D.)  In that correspondence, Klineburger reiterated that

Monnin was "not subject to any arbitration provisions, has not entered into an agreement with

[JAMS] and [would] not be participating in any JAMS resolution services."  (*Id.*)  In August,

Meredith Stockman, the Case Coordinator for the Monnin matter at JAMS, repeatedly emailed

Monnin directly regarding the case, discussing outstanding invoices for the proceedings and

scheduling.  (*Id.*, Exs. F, G.)  On August 27, 2012, in response to these emails, Klineburger

contacted JAMS via email and stated that Monnin "never contracted with [JAMS] for any

services whatsoever," and as such, had "no intention of going forward with anything involving

such dispute resolution."  (*Id.*, Ex. H.)  Klineburger also mandated that as Monnin was

represented by counsel, JAMS was never to "contact her directly ever again."  (*Id.*)  Again,

Monnin was copied on this correspondence.

On August 29, 2012, JAMS notified MUO and Monnin, via counsel, of a scheduled

conference call with Arbitrator Katz on September 14, 2012.  (*Id.*, Ex. I.)  Klineburger, copying

Monnin, responded to this notice with another letter to JAMS, stating: "Neither myself [sic] nor

Ms. Monnin will have a conference call in the above captioned matter since there is nothing to

have a conference call about."  (*Id.*, Ex. J.)  Accordingly, the conference call proceeded without

Monnin or Klineburger.  On September 4, 2012 Case Manager Stockman emailed Klineburger

regarding the balance owed to JAMS for the arbitration.  (*Id.*, Ex. K.)  Klineburger responded

and asked for a "signed agreement with [JAMS] wherein either myself [sic] and/or my client

agreed to utilize your services."  (*Id.*, Ex. L.)  Klineburger concluded his September 5 email to

JAMS by asking that JAMS "leave [him] and Ms. Monnin alone."  (*Id.*)

19

On September 19, 2012, Arbitrator Katz issued a Report of Preliminary Conference and Scheduling Order, noting Monnin's failure to respond to the Statement of Claim and scheduling the Hearing for November 5, 2012.  This Order was sent to Klineburger.  (Balber Decl., Ex. J.) JAMS also sent Klineburger a separate notice of hearing.  (*Id.*, Ex. K.)  As Arbitration proceeded, Monnin remained non-participatory, failing to respond to the document requests that MUO served on Klineburger on September 21, 2012 (*id.*, Ex. L), and choosing not to conduct any discovery of her own.  Additionally, neither Monnin nor Klineburger on her behalf submitted a pre-hearing memorandum, exhibits, or a witness list, as directed by Arbitrator Katz's Order of September 20.  On November 2, 2012, JAMS again contacted all parties, including Klineburger, confirming that the Arbitration Hearing would go forward on November 5, 2012. (Klineburger Decl., Ex. M.)  Klineburger then sent a letter to MUO and counsel, attaching a draft complaint against MUO and Donald Trump, stating that he intended to file the complaint in the Western District of Pennsylvania; Monnin was copied on that correspondence.  (*Id.*, Ex. N.) According to MUO, on November 2, 2012, Klineburger participated in a telephone call with Scott S. Balber, MUO's attorney in the Arbitration, and Michael Cohen, Executive Vice President of the Trump Organization.  (MUO Rep. at 6.)  Klineburger reportedly said during the call that he had been speaking to Monnin and that unless MUO withdrew the Arbitration, he would file the complaint against Trump and MUO.  Additionally, when asked if he planned to appear at the Arbitration Hearing, Klineburger stated that Monnin was still considering her options.  (*Id.*)

Neither Monnin nor Klineburger appeared for the Arbitration Hearing on November 5, 2012.  (*See* Monnin Decl., Ex. K.)  On December 10, 2012, Klineburger received an email from Monnin's father, Phillip Monnin, thanking him for "successfully removing [the MUO] threat of

arbitration[,]" and inquiring as to the status of the complaint against Mr. Trump.  (Klineburger Decl., Ex. O.)  Klineburger did not "immediately respond" to Mr. Monnin's correspondence, and three days later, JAMS sent Klineburger a copy of the Final Arbitration Award entered by Arbitrator Katz.  (*Id*. at ¶¶ 27-28.)  Klineburger claims that this email from JAMS was the first time he learned, "contrary to Philip Monnin's December 10, 2012 email and unbeknownst to Monnin, that the Arbitration had proceeded before Arbitrator Katz on November 5, 2012." (*Id*. at ¶ 30.)  At this juncture, Klineburger sent a letter to JAMS Case Manager Stockman, stating as follows:

> Please be advised that I never requested to go forward with arbitration in the above captioned matter.  For some strange reason, you people think by sending me bills and correspondence relating to a matter in which I had no involvement, somehow or another makes me responsibility [sic].  Let me make this clear: I do not represent Ms. Monnin with regard to this matter.  I did not sign any documentation subjecting either myself or Ms. Monnin through this process.  Please stop bothering me.  This is annoying.  I owe nothing. . . . I do not represent Ms. Monnin with regard to this matter.  If you wish to contact her directly, please feel free to do so.  I will not waste anymore [sic] time with this matter.

(*Id.*, Ex. R.)

In a declaration, Klineburger states that since he never received a substantive response from JAMS regarding the signed agreement he requested, he "believed the matter to be resolved."  (*Id.* at ¶ 24.)[5]  He also states that "although [he] alone was copied on correspondence

---

[5] As discussed, after signing and initialing her contract with MUO, Monnin received an unsigned copy of the Agreement, which included the Arbitration Clause.  She provided this document to Klineburger, who concluded, because he never received a copy of the signed version, that his client, Monnin, was not subject to the Arbitration Clause or the agreement.  (*Id.* at ¶¶ 6, 12, 22, 24.)  However, copies of the signed Agreement were part of the record of the Arbitration Hearing (*see* Final Award, Ex. 3 (citing the Agreement as an exhibit and discussing its terms)), and the Proof of Service reflects that MUO's demand for arbitration, statement of claim, and a copy of the official entry form were all served on Monnin on June 25, 2012. (*See* Balber Decl., Ex. B.)

from JAMS after September 5, 2012, [he] felt it unnecessary to respond or to forward same to

Monnin." (*Id.*)  Klineburger admits that he had "no communication with Monnin regarding

JAMS or Miss Universe's attempt to arbitrate at a hearing on any particular date" for the two-

month period between September and November 2012.  (*Id.*)  According to Monnin, she was

shocked to receive correspondence from Klineburger on December 13, 2012 stating as follows:

> It seems that despite evert [sic] effort on my part in indicating that
> we were not proceeding with the arbitration, the attorneys for Miss
> Universe and Donald Trump went ahead and had arbitration
> without anyone present on your behalf.  I am not licensed to
> practice law in the State of New York.  Therefore, I cannot give
> you advice on this arbitration matter.

(Monnin Decl., ¶ 81.)  Monnin was "shocked" to receive this last of Klineburger's

correspondence, as she was under the impression that the situation had been handled by counsel,

and had been told repeatedly by Klineburger that she was not required to participate in the

Arbitration proceedings.  (Monnin Opp. at 16.)

## 2.   The Arbitration's Fundamental Fairness in Light of Notice

First and foremost, as discussed above, Monnin herself received consistent

communication from MUO, counsel to MUO, JAMS, and later, Arbitrator Katz, detailing the

various stages of the Arbitration proceedings.  Not only was she initially served with the

Statement of Claim, but several of the aforementioned parties were in constant contact with

Monnin via email and letter for several months.  Monnin ceased receiving correspondence only

when Klineburger confirmed and emphasized his representation of Monnin, and mandated that

all future correspondence regarding the Arbitration be directed at Klineburger, rather than his

client.  MUO, counsel to MUO, and JAMS all complied with this directive, and were

subsequently in constant contact with Klineburger.  While it is unfortunate and perhaps unfair

that Klineburger, likely in violation of the Model Rules of Professional Conduct, failed to communicate with his client for several months, despite receiving repeated entreaties and status updates regarding the Arbitration, it is well established that notice to an attorney constitutes notice to the represented client. *See Ogodor v. City of New York*, No. 98 Civ. 5353 (LAK)(RLE), 2001 WL 210192, at *3 (S.D.N.Y. Feb. 26, 2001), *report and recommendation adopted*, March 14, 2001 ("Notice to an attorney qualifies as notice to a client and thus Taubman's receipt of the EEOC Right To Sue letter constituted Ogodor's receipt of the letter."); *accord McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 5 (1st Cir. 1991) ("Notice to an attorney is notice to the client." (citing Fed. R. Civ. P. 5(b); *Irwin v. Veterans Administration*, 498 U.S. 89, 111 (1990)).

The situation here is akin to that in *Euromarket*, 2009 WL 2868725.  In that case, Respondent McGovern & Co., LLC sought vacatur of an arbitration award entered against it, citing a lack of fundamental fairness due to the lack of notice, as McGovern itself never had any actual notice of the hearing, because its General Counsel, Michael P. Goldsmith "handled all aspects of the underlying arbitration between the parties," and chose to keep "the arbitration proceeding a secret, and [] never informed McGovern that an arbitration hearing had been scheduled." *Id*. at 2.  As here, McGovern did not appear at the Arbitration Hearing, and was unaware of its existence until much later.  *Id.*  Despite these circumstances, and despite the fact that Goldsmith turned out to be a disbarred attorney incapable of actual representation, the *Euromarket* court upheld the fundamental fairness of the award, noting:

> [T]he undisputed facts, and Respondent's admissions of record, indicate clearly that Respondent, *through its designated representative*, received notice of the arbitration proceedings and was afforded the opportunity to be heard.  There is no dispute that Goldsmith, an officer of McGovern LLC, was on notice of the

> arbitration proceedings and of the hearing. Goldsmith participated
> in the preliminary hearing, during which the June evidentiary
> hearing date was set.   He communicated with the AAA via
> facsimile and email.   Goldsmith's own adjournment request
> indicates that he was aware of the date of the hearing. Additionally
> a March 3, 2008, letter from the AAA reminded the parties that the
> arbitration could proceed, pursuant to the AAA Rules, in the
> absence of any party who, after due notice, failed to be present or
> to obtain an adjournment.

*Id.* at *5 (internal citations omitted) (emphasis added).  At bottom, Arbitrator Katz, together with

MUO and JAMS, like the arbitrator and petitioners in *Euromark*, "provided the requisite notice

to Respondent's representative," "did not prevent Respondent from presenting evidence, or limit

the type of evidence that Respondent could present, nor . . . prevent Respondent from cross-

examining witnesses or otherwise defending its position."  *Id.*  In sum, Klineburger's "alleged

failure to communicate properly with his client and the resultant [award] [] cannot be attributed

to any flaw in the arbitral proceedings."  *Id.*  Moreover, as in *Euromark*, Arbitrator Katz "did not

merely enter a default judgment against Respondent for failure to appear at the hearing."  *Id.*

Instead, he carefully considered the evidence presented and the relevant law.

Second, both Monnin and Klineburger contend that the lack of valid notice is

underscored by the fact that neither JAMS nor MUO ever provided Klineburger with a copy of

the signed contract in which Monnin agreed that all disputes with MUO would be submitted to

mediation and, if unresolvable, to arbitration.  (*See* Klineburger Decl., ¶ 24 ("Having received no

substantive response from JAMS, I believed the matter to be resolved.  No signed arbitration

agreement had been produced between Miss Universe and Monnin; even if there was a signed

agreement it terminated when she resigned; and there was no signed agreement with JAMS.");

*id.*, ¶ 33 ("The first time I saw any signed arbitration agreement was when Miss Universe

attached one to its Petition to Confirm the Final Arbitration Award filed in this Court.").)  These

24

assertions, however, do not nullify the valid notice of the Arbitration proceedings, nor do they present a valid excuse for non-participation.  It is well established that "[r]efusal to participate in an arbitration proceeding is not required in order to preserve an objection to arbitrability.  On the contrary, the purpose of the Federal Arbitration Act is to encourage participation."  *Nat'l Ass'n of Broadcast Employees & Technicians AFL-CIO v. Nat'l Broadcasting Co.*, 707 F. Supp. 124, 130 (S.D.N.Y. 1988); *cf. Bridgepointe Master Fund Ltd. v. Biometrx, Inc.*, No. 09 Civ. 6874, 2009 WL 4756440, at *3 (S.D.N.Y. Dec. 11, 2009) ("While BMRX complains of short notice, in fact, it had ample notice of the arbitration.  Instead, it deliberately chose not to participate.  Indeed, it appears in light of its non-performance of the financial agreement and failure to pay the amount due and owing, which it does not contest, the BMRX made a tactical choice to absent itself from the arbitration."); *see also Michaels v. Mutual Marine Office, Inc.*, 472 F. Supp. 26, 31 (S.D.N.Y. 1979) (noting that participation in an arbitration proceeding "clearly" can be "without prejudice to [a] [] denial of liability").  Accordingly, Monnin could have preserved her apparent objection to arbitrability while nevertheless participating in the process.  Moreover, JAMS' alleged failure to provide Klineburger with a copy of the Agreement between Monnin and MUO is a red herring for two reasons.  First, Monnin herself had signed the Agreement and it was part of the record for the Arbitration proceedings, and second, Klineburger failed even to serve document requests on MUO's counsel that encompassed the Agreement, as he refused to participate in *any* pre-Hearing briefing or exchange.

In sum, the record establishes that Monnin received ample notice—both actual and constructive through her counsel—of the Arbitration proceedings.  The onus was on her to inquire as to the status of those proceedings when she had heard nothing from her counsel, MUO, or JAMS for several months.  Moreover, Monnin's apparent objections to arbitrability

could have been preserved despite her participation.  Thus, the Arbitration was not fundamentally unfair.

### 3.      Conduct of Monnin's Counsel

Although not grounds for vacatur, the Court notes the apparent deficiency of Klineburger's representation of his client, Monnin, throughout these proceedings.

Klineburger undisputedly held himself out as Monnin's counsel and representative for both the Arbitration and other "ancillary proceedings," only to later disavow this relationship, informing Monnin that he is not licensed to practice in New York, and thus, was unable to give her advice on the Arbitration matter.  Additionally, Klineburger directed JAMS and MUO to cease all direct contact with Monnin, but admittedly failed to communicate with her regarding the status of the Arbitration for months at a time, in clear contravention of the Rules of Professional Conduct.  *See, e.g.*, Model Rules of Prof'l Conduct R. 1.4(a)-(b) ("A lawyer shall: . . . reasonably consult with the client about the means by which the client's objectives are to be accomplished; [] keep the client reasonably informed about the status of the matter; . . . and . . . [] [a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.").

Moreover, Klineburger, without citing any authority, and without any apparent consideration of the consequences of non-participation, repeatedly asserted that his client was simply not required to engage in mediation or arbitration, as provided for in the applicable Agreement.  Seemingly oblivious to the facts that (1) the Arbitration could, and would, proceed in Monnin's absence; and (2) the law permitted Monnin to participate without conceding arbitrability, Klineburger ignored all entreaties and document requests, failed to draft a pre-hearing brief, and did not represent his client in the Arbitration, despite claiming to serve as her

counsel and representative.  *See id.* R. 1.1 ("A lawyer shall provide competent representation to a

client.  Competent representation requires the legal knowledge, skill, thoroughness and

preparation reasonably necessary for the representation."); *id.* R. 1.3 ("A lawyer shall act with

reasonable diligence and promptness in representing a client.").  Klineburger's contention that

he, in good faith, believed that Monnin was not bound by the Agreement excuses neither his

failure to communicate with her, nor his choice not to engage in document discovery or exhibit

designations, which would have likely resulted in production of the very Agreement he

repeatedly claimed to disavow.

Monnin, as the individual affected by, and initially served with, the Statement of Claim,

cannot be absolved entirely for her indifference to the proceedings that occurred, over the course

of several months, without her participation.  Nevertheless, it does well to note that Monnin was

repeatedly advised by counsel that she need not participate in the Arbitration.  Blindly, but

perhaps understandably, Monnin put her trust in her attorney, believing that he would represent

her interests to the best of his ability throughout the Arbitration process.  Unfortunately,

Klineburger chose to ignore the responsibilities owed to his client, along with the ethical duties

governing his profession.  And while the notice given to Monnin and Klineburger was legally

valid, and the arbitral process fundamentally fair, Monnin is now faced with dire consequences

due, in no small part, to her counsel's ineptitude, which constitutes a harsh result.

### C.    Manifest Disregard of the Law

Finally, Monnin seeks vacatur of the Arbitration Award on the ground that Arbitrator

Katz exhibited a manifest disregard for the law, as defined by the Second Circuit in *Jock*.  *See*

646 F.3d at 121-22 ("In addition to the section 10(a) grounds for vacatur, we have recognized a

judicially-created ground, namely that 'an arbitral decision may be vacated when an arbitrator

has exhibited a manifest disregard of law.'" (quoting *Westerbeke Corp.*, 304 F.3d at 208 (footnote omitted)).

"A party seeking to vacate an arbitration award on the basis of manifest disregard of the law must satisfy a two-pronged test, proving that: '(1) the arbitrator knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator was well defined, explicit, and clearly applicable to the case.'" *Gottdiener*, 462 F.3d at 110-11. Manifest disregard is a rigorous standard, and it reflects far "more than error or misunderstanding with respect to the law." *Id.* at 111 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986) (quotations omitted)). The Second Circuit clarified in *DiRussa* that manifest disregard does not refer to merely a "controlling legal principle" and "obvious error" in ignoring it; by contrast, "the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." *DiRussa*, 121 F.3d at 821 (quoting *Bobker*, 808 F.2d at 933)).

Here, Monnin contends that Arbitrator Katz correctly stated, and was accordingly well aware of, the controlling precedent on defamation, but nevertheless refused to apply the law. (*See* Monnin Opp. at 24-25.) The crux of Monnin's argument is that "there was absolutely no evidence offered at the arbitration hearing to suggest Sheena's comments caused BP to cancel its sponsorship." (*Id.* at 25.) The Court disagrees.

First, Arbitrator Katz carefully considered the evidence before him, describing various ways in which Monnin's statements resulted in "immediate economic consequences" for MUO, including the loss of BP's sponsorship. (*See* Final Award, at 14.) The Award painstakingly examines the evidence provided with respect to the traditional relationship between the Miss Universe Pageant and the host site, discussing the importance of the "site fee" as a source of

revenue for MUO.  (*Id.* at 12.)  Accordingly, there is far more than a "barely colorable"

justification for the result reached in Arbitrator Katz's decision.  And second, Monnin's

argument with respect to manifest disregard is ultimately a disagreement with Arbitrator Katz's

factual findings: namely, that the evidence revealed that the BP sponsorship was lost as a result

of Monnin's statements.  Manifest disregard would have been reflected if Arbitrator Katz knew

of the requirement that MUO prove causation, for example, but chose not to demand it of them,

regardless of this knowledge.  The vacatur that Monnin seeks on this ground is nothing more

than a disagreement with Arbitrator Katz's application of the admittedly correct legal standard.

*See, e.g.*, *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) ("A federal court cannot vacate an

arbitral award merely because it is convinced that the arbitration panel made the wrong call on

the law.  On the contrary, the award 'should be enforced, despite a court's disagreement with it

on the merits, if there is a *barely colorable justification* for the outcome reached.'" (quoting

*Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003)

(emphasis in original)).  Accordingly, vacatur is inappropriate, as Arbitrator Katz did not

manifestly disregard the law in reaching his decision.

**IV.     Conclusion**

The Court does not take lightly that Monnin is compelled to pay what is a devastating

monetary award.  Moreover, Monnin undeniably is suffering from her poor choice of counsel,

who unconscionably chose to absent himself from the Arbitration proceedings, advised Monnin

to do the same, and presented no evidence on her behalf over the course of several months.

Although Monnin should have initially engaged in mediation and later, remained diligent over

the course of the Arbitration process, it is clear from the record that she was woefully unaware of

29

both the consequences of her disengagement and the severity of the allegations in the Statement of Claim.

That being said, a court's role in reviewing an arbitration award is necessarily limited, and such decisions may be set aside only in certain, enumerated circumstances.  Accordingly, the Court is bound by the law, and its review may not exceed the scope defined for it by this Circuit's precedent.  Sympathy, or apparent inequity, may play no role in a court's legal analysis, and here, the law is clear.

For the foregoing reasons, the Arbitration Award entered by Arbitrator Theodore H. Katz, is CONFIRMED and Respondent's petition to vacate the Award is DENIED.

The Clerk of Court is directed to enter judgment accordingly, to close the motion at docket entry number 16, and to close the case.

SO ORDERED.

Dated: New York, New York
      July 2, 2013

J. PAUL OETKEN
United States District Judge